Spear, J.
The ground of the demurrer is the alleged invalidity of the statute on which the prosecution is based. That statute (section 6995, Revised Statutes) is:
“Whoever, except a female or blind person, not being in the county in which he usually lives or has his home, is found going about begging and asking subsistence by charity, shall be taken and deemed to be a tramp; -any tramp who enters a dwelling house, or yard or inclosure about a dwelling house, against the will or without the permission of the owner or occupant thereof, or does not, when requested, immediately leave such place, or is found carrying a firearm, or other dangerous weapon, or does or threatens to do any injury to the person, or real or personal property of another, shall be imprisoned in the penitentiary not more than three years nor less than one year; and any person may, upon view of any such offense, apprehend such offender, and take him before a justice of the peace, or other examining officer, for examination.”
It is contended that the section contravenes our bill of rights, and section 26 of article 2 of the constitution, and the fourteenth amendment to the constitution of the United States.
The indictment is:
“That Timothy Hogan, late of the county of Scioto aforesaid, on the fourth day of January, in the year of our Lord, one thousand, nine hundred, in the county of Scioto aforesaid, not'being then and there a female person, and not being then and there a blind person, and not being then and there in the county in which he usually lives and has his home, and being then and there found going about begging and asking subsistence by charity, and being then and there a *209 tramp, did unlawfully and purposely threaten to do an injury to the person of another, to-wit: to the person of Ferdinand C.Searl,Jr.,contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state of Ohio.”
It will be noted that the specific charge is that the defendant, being a tramp, did unlawfully -and purposely threaten to do an injury to the person of another. Our inquiry is, therefore, specially directed to the sufficiency of the indictment and the validity of the statute as to the acts charged, and the right of the state to prohibit and punish them as prescribed. In brief the claim against the law is that it deprives persons of liberty without due process of law and denies to them the equal protection of the laws, and deprives of the right of seeking and obtaining happiness and safety; that it is an act of a general nature but not of uniform operation throughout the state; and that it subjects the accused to a cruel and unusual punishment. And it is specifically urged that the act does not operate uniformly because it provides a punishment for an offense committed in one county different from punishment for a like act committed in another, inasmuch as the offense of threatening to do injury to the person or property of another in a county other than that of the residence of the accused may be punished by incarceration in the penitentiary, while if done in the county of his residence is at most a misdemeanor.
It is conceded that the law is of a general nature. The test of uniform operation, and with respect to the required conformity to the “law of the land” and to the requirement of “due process of law,” seems to be that if the law under consideration operates equally upon all who come within the class to be af *210 fected, embracing all persons who are or -may be in like situation and circumstances, and tbe designation of tbe class is reasonable, not unjust nor capricious or arbitrary, but based upon a real distinction, tbe law does operate uniformly, and if, added to tbis, tbe law is enforced by usual and appropriate methods, tbe requirement as to “due process of law” is satisfied. As said by Mr. Justice Field, in Dent v. West Virginia, 129 U. S., 114: “Sucb legislation is not open to tbe charge of depriving one of bis rights without due process of law, if it be general in its operation upon tbe subjects to which it relates, and is enforceable in tbe usual modes * * * adapted to tbe nature of tbe case.” It is not essential that it operate upon all tbe inhabitants of tbe state; nor is it an objection that it distinguishes a class. In tbe very nature of things, tbe law must, in dealing with persons and property and governmental divisions, group persons or objects having similar attributes into classes, and tbe general assembly must legislate appropriately for each, and unless it is made manifest that sucb legislation is directly forbidden by tbe constitution, or tbe attempted classification is purely arbitrary, unreasonable, unjust or capricious, tbe power of tbe general assembly to thus classify cannot be successfully challenged. Nor is it an objection to a penal statute that it does not apply to all persons who might by any possibility commit tbe act interdicted. It is for tbe legislature to determine bow far to go in order to afford tbe desired protection to society. The exemption of some, where it does not interfere with tbe rights of others, is not open to objection on constitutional grounds. Tbe principle is illustrated in tbe statute under review. Females and blind persons are not included within its terms. Tbis, *211 presumably, from considerations of humanity, but principally because but little, if any, danger is. threatened from such, and this exemption has not met with objection in this case. The act in question undertakes to define a tramp, or vagrant, by stating-what acts shall constitute such character. It is, in the main, the old method of describing a vagrant, and vagrancy, time out of mind, has been deemed a condition calling for special statutory provisions, i. e.r such as may tend to suppress the mischief and protect society. These provisions rest upon the economic truth that industry is. necessary for the preservation of society, and that he who, being able to work, and not able otherwise to support himself, deliberately plans to exist by the labor of others, is an enemy to society and to the commonwealth. The statute applies to all of the class described no matter where in the state they may be found; it does not subject any coming within the designation to a different restriction, or accord to any a different privilege under like conditions. So that, unless there is controlling force in the objection that the statute seeks to punish an offense committed in one county in a different way from a like offense committed in another county, the law cannot be held wanting in uniformity of operation. If the rule is that every criminal act of similar nature or character must meet with like condemnation and like punishment, without respect to whether the circumstances under which it is committed are the same or are different, then the statute in question cannot be maintained. But is that the rule? Is it not manifest that a criminal act committed under some circumstances and in some situations may be followed by consequences infinitely more serious than if committed under different cir *212 cumstances? Take the crime of forcibly breaking into a dwelling house with intent to steal or commit a felony. If done in the night season it is burglary and punished accordingly; if in the day season it is punished otherwise, and always has been; at least the distinction in the two offenses has always been observed. Why? There can hardly be any difference between them as to moral turpitude. The reason is simply that the consequences as. to injury to persons, by bodily harm to the inmates of the house, or by terrorizing them, are immensely greater in the one case than in the other, and the chances of detection less. Shall the burglar be heard to complain because he is punished with more severity than the mere housebreaker? Again we have a statute (section 7024) making it a penitentiary offense for a teacher to have sexual intercourse with any pupil with her consent while under his instruction, and this without respect to the age of either. Shall a seducer who offends against this statute be heard to say that he should not be punished because another man, not a teacher, had he accomplished the rhin of the same woman, would have gone scot free? Hardly. One Brown made that plea to this court, but the court Brown v. State, 38 Ohio St., 374, refused to entertain it, and held the law to be valid. Here, too, the moral turpitude may not be greater, but there is an essential difference in the condition of the parties. The opportunity for winning trust, confidence and influence is likely to be much greater in the one case than in the other. Hence a similar act by the one is severely punished, while if by another no criminal punishment may follow. The distinction sought to be drawn is illustrated further by the United States statutes relating to mutiny, piracy, the slave trade,. *213 and other offenses upon the high seas, sections 5359 to 5384, U. S. Revised Statutes. Piracy, by the law of nations, is any robbery or forcible depredation on the high seas without lawful authority, done animo furandi, and offenses against this law, where the party is brought into or found in the United States, are punished by death. Congress, under authority of article 1, section 8, of the constitution, has further defined and provided for the punishment of piracy, and by the provisions of the sections referred to, robbery on the high seas is made piracy and punishable with death. So, too, any captain or mariner who piratically and feloniously runs away with a vessel, or any goods or merchandise thereon, of the value of fifty dollars, or voluntarily yields such vessel to pirates; or any seaman who forcibly endeavors to hinder his commander from defending the ship or goods, or makes revolt in the ship, shall be adjudged a pirate and suffer death. So, tod, any person who, on the high seas, willfully and corruptly, casts away or otherwise destroys any vessel of which he is the owner in whole or in part, with intent to injure an owner, underwriter, or merchant having goods thereon; and any person not being an owner, who on the high seas, willfully and corruptly casts awmy or otherwise destroys any vessel to which he belongs, the property of any citizen, shall suffer death. So in regard to the slave trade it is provided that anyone being of the crew of any foreign vessel engaged in the slave trade, or of any vessel owmed, in whole or in part, or navigated by any citizen, wdto forcibly confines or detains on board such vessel any negro or mulatto with intent to make such negro or mulatto a slave, or offers to sell such person, or anywhere on tide water transfers to any vessel such *214 person, or delivers on shore from on board such vessel snch person, with intent to make sale of snch person, and whoever, being of such crew, seizes any negro or mulatto with intent to make such person a slave, or decoys or forcibly brings or carries or receives such person from such offender, is a pirate and shall suffer death. Acts of a similar nature, but of less turpitude, are punished by heavy fines or by imprisonment at hard labor from two to seven years, or both.
Has anyone ever heard of a jack tar accused of mutiny, or a captain of piracy, or a miscreant engaged in the slave trade, successfully maintaining that because insubordination by an employe on the land, or robbery, or the dealing in human flesh, is punished in a different manner, or with less severity, or not punished at all, is a reason why he should not be convicted and have his miserable existence terminated on the gallows or at the yard-arm? And yet every one familiar with criminal law will at once recognize the enormous difference between the punishment meted out under these sections and that inflicted upon persons guilty of offenses of like nature within domestic waters, or on land, and it must be manifest that the ground for distinction is found in the differing circumstances. One prominent consideration moving to the legislation doubtless was that piracy and the slave trade were offenses not only against humanity, but against civilization, committed under circumstances making successful resistance by the intended victim next to impossible, and detection and apprehension of the guilty party extremely difficult. Piracy had become an organized' system of robbery, often, nay generally, involving murder, and extending in its operation over the *215 whole globe; and the slave trade, a system even worse, combining as it did remorseless greed and barbarous cruelty inflicted upon scores and hundreds of innocent victims, and the intent of the law was not, and is not, so much to punish or reform the individual offender as it is to break up and destroy the practice. To accomplish this it was matter of stern necessity to make all participation in any act which in its nature aided the main purpose, a grave, and usually a capital offense, punishable with unusual severity, and technical objections could not be allowed to stand in the way of the great purpose to be accomplished.
Does it not seem that, in principle, we have a parallel case? Speaking of the class, the genus tramp, in this country, is a public enemy. He is numerous and he is dangerous. He is a nomad, a wanderer on the face of the earth, with his hand against every honest man, woman and child in so far as they do not, promptly and fully, supply his demands. He is a thief, a robber, often a murderer, and always a nuisance. He does not belong to the working classes, but is an idler; he does not work because he despises work. It is a fixed principle with him that, come what may, he will not work. He is so low in the scale of humanity that he is without that not uncommon virtue among the low of honor among thieves. He will steal from a fellow tramp, if in need of what that'fellow has, and will resort to violence when that is necessary. So numerous has the class become that the members may be said to overrun the improved parts of the country, especially the more thickly settled portions. They beat their way upon railroads, - and other lines of communication, and resent with vicious violence any attempt on the part of the railroad employes and others to drive them off. They *216 plod through the rural districts appearing suddenly at farm houses, and other houses where it is probable that unprotected women and children may be found, and brutally coerce compliance with their demands for food, or whatever else they may desire, terrorizing the people and adding still further discouragements to life in isolated places. It will not be understood that there may not be differences in tramps. There may be. Some may be less worthless and vicious than others; but all pirates were not alike brutal and bloody. We read of one who is said to have been “as mild mannered a man as ever scuttled a ship or cut a throat.” Yet they are all denounced alike as pirates. A specially discouraging feature of the tramp life is that it offers captivating attractions to a class of idle young men, usually dissipated, who become restive under control, and join the tramp army in part from a craving for new scenes and daring adventures, and a license which is denied them in the home neighborhoods. They may at first be somewhat guarded in conduct, but that quite soon disappears and they become as importunate and reckless as the oldest vagrant. Although not connected by any tie which insures honorable treatment one of another, the tramps nevertheless have sufficient organization to maintain a code of signs by which those who follow may know the treatment received by those who have shortly before preceded, and to be advised of places for common rendezvous. They thus are able to avoid locations where the citizens resolutely refuse them, or where the laws are rigidly enforced, and confine their depredations to sections where the people meekly submit, and are enabled to congregate, and they do congregate, in such numbers at agreed points as to become a source of serious *217 menace to the peace and good order of such neighborhoods. The whole system has become so gross an abuse as to require the strong hand of the law for its suppression, and the abuse is so patent that courts, cannot properly refuse to take judicial notice of it. It is to be constantly borne in mind that the act in question is intended to afford some adequate security to the public against dangers to be apprehended from the class described, all of whom, from their want of honest employment, or from their vicious pursuits, may well be considered as dangerous to society. This security cannot be obtained by attempts at enforcing-this or any law if the efforts of the prosecuting officers in the interest of the people are to be overborne by technical and unsubstantial objections. This much as to the necessity of some law. Why not this law?' Is there not sufficient difference between the condition and opportunity of a pauper in his own county,, and the same character abroad, and between the situation of the people of the county where the pauper resides and those of distant neighborhoods, to warrant a legal distinction? In the county of his residence the pauper, when in necessitous circumstances and unable to supply his own physical needs, and he is often in that condition, has the legal right to call upon the poor authorities for support, and those-authorities have the right and the power to use the proper public funds for that purpose. Ordinarily such persons become quite well known and the people are less apt to be terrified by them and induced through fear to yield to their demands than where-they are strangers, and the paupers themselves are-much less likely to become ruffians when at home and. comparatively isolated than when they have burned their bridges, so to speak, and started on a tramp in *218 pastures new, and joined their fortunes with others of like ilk. In short, tramping makes a different character of the same person. And why may they not, when thus grouped, be regarded as a class? The grant of legislative power by section 1, of article 2, of our constitution is as ample as that given congress by the federal constitution as to piracy, and we deem the power broad enough to warrant the general assembly in constituting the tramp a class by himself and legislating for his suppression.
The objection that the act prescribes a cruel and unusual punishment we think not well taken. Imprisonment at hard labor is neither cruel nor unusual. It may be severe, in the given instance, but that is a question for the law-making power. In re Kemmler, 136 U. S., 436; Cornelison v. Commonwealth, 84 Ky., 583. The punishment, to be effective, should be such as will prove a deterrent. The tramp cares nothing for a jail sentence; often he courts it. A workhouse sentence is less welcome, but there are but few workhouses in the state. A penitentiary sentence is a real punishment. There he has to work and cannot shirk.
But it is insisted that the bill of rights is infringed because the act forbids the tramp to bear arms. The question was not involved in this prosecution, but we see no real difficulty in it. The constitutional right to bear arms is intended to guarantee to the people in support of just government such right and to afford the citizen means for defense of self and property. While this secures to him a right of which he cannot be deprived, it enjoins a duty in execution of which that right is to be exercised. If he employs those arms which he ought to wield for the safety *219 and protection of his country, his person and his property, to the annoyance and terror and danger of its citizens, his acts find no vindication in the bill of rights. That guarantee was never intended as a warrant for vicious persons to carry weapons with which to terrorize others. Going armed with unusual and dangerous weapons to the terror of the people is an offense at common law. A man may carry a gun for any lawful purpose, for business or amusement, but he cannot go about with that or any other dangerous weapon to terrify and alarm a peaceful people. Knight’s case, 3 Mod., 117; State v. Huntly, 3 Ired., (N. C.), 418; State v. Roten, 86 N. Car., 701. And statutes punishing such offenses are constitutional. Galvin v. State, 6 Coldw. (Tenn.), 284; Andrews v. State, 3 Heisk. (Tenn.), 165.
Statutes intended to suppress the tramp nuisance have been enacted by a number of the states of the union, notably Vermont, New Hampshire, Massachusetts, Rhode Island, Pennsylvania, Indiana, Iowa and Wisconsin. These statutes are like that of Ohio so far as classification is concerned, and nearly all prescribe a like punishment. All do not make a distinction between acts committed in a county in which the tramp does not reside and similar ones in the county of his residence, but most do. The validity of the Wisconsin statute is doubted in Johnson v. Waukesha Co., 64 Wis., 281, but apparently sustained in Murphy v. State, 86 Wis., 626. That of Pennsylvania where punishment is committal for not more than one year in a workhouse, is apparently sustained in Commonwealth v. Gill, 7 W. N. C., 557. To what extent these acts have been sustained or invalidated by decisions in the other states, we are not apprised, but the enactments themselves *220 indicate that the legislatures of those states have considered that the situation calls for stringent measures of suppression.
We are of opinion that the law in question is one calculated to secure the repose and peace of society,, and that it is not open to the objections made against it.

Exceptions sustained.