(May 28, 1902.)

## In re L. F. INMAN.
[69 Pac. 120.]

CONSTITUTIONAL LAW—STATUTE—APPOINTIVE OFFICE.—A legislative enactment providing for a state board of medical examiners, and authorizing the governor to appoint such board, without the concurrence of the Senate, does not contravene section 1 of article 2, nor section 6 of article 4 of the constitution of Idaho.

SAME—JUDICIAL POWER.—The act of March 3, 1899, commonly known as "the medical bill," is constitutional, and does not vest judicial power in the state board of medical examiners.

SAME—POLICE POWER.—Said act of March 3, 1899, does not violate the rule against special or class legislation, nor the rule of "equality before the law," and does not grant special immunities to special classes, but its enactment is a valid exercise of the proper police power of the state.

(Syllabus by Quarles, C. J.)

ORIGINAL proceeding for writ of *habeas corpus*.

I. N. Smith, for Petitioner.

The law is void in its creation of the offices as it provides for the appointment of a member thereof by the governor alone. (Const., art. 2, sec. 1, art. 4, sec. 6; *Clayton v. Territory of Utah*, 132 U. S. 632, 10 Sup. Ct. Rep. 190, 33 L. ed. 455.) The provision at the latter part of section 1 of the medical laws of 1899 is in conflict with the constitution. The expression "otherwise provided for," as found in section 6, article 4, of the constitution, is clearly meant to provide for "otherwise provided in the constitution." (Const., art. 1, secs. 10, 12; art. 5, secs. 11, 15, 18, 19, 24, 27.) What officers the governor can appoint are specifically named in the constitution.

(See Const., art. 10, sec. 5; art. 13, sec. 1.)   At section 5 of
the medical law it is provided as follows: "Persons who re-
ceived a license under the now defunct law of 1897 will simply
be required to transmit such license." The law at this place
gives to the license, issued by virtue of the law which was de-
clared void, as never having passed the legislature as required,
and hence never had any existence whatever. (*Brown v.
Collister*, 5 Idaho, 589, 51 Pac. 417.)   It will be conceded
that "police power" is a legislative power; that when not viola-
tive of constitutional requirements, such power, when exercised,
is final.   But even police power is subject to the constitution.
All departments of the government must of necessity be gov-
erned by the constitution, and subject to its mandates.   This
law exempts railway surgeons from both its criminal and civil
provisions; it therefore exempts this class.   (*State v. Hinman*,
65 N. H. 103, 23 Am. St. Rep. 22, 18 Atl. 194; Cooley's Con-
stitutional Limitations, 391; *Union Sewer Pipe Co. v. Connally*,
99 Fed. 354; *Yick Woo v. Hopkins*, 118 U. S. 356, 8 Sup. Ct.
Rep. 1064; *Dent v. West Virginia*, 129 U. S. 114, 9 Sup. Ct.
Rep. 231.)   This law is likewise violative of Idaho constitu-
tion at section 8, article 7, because it exempts railway surgeons
from the tax imposed upon other surgeons.   The law is also
unequal within the decision of *State v. Pennoyer*, 65 N. H.
113, 18 Atl. 878.   A statute providing for a proceeding affect-
ing one's property rights  must itself provide for notice to him,
and failing to do so, is unconstitutional and void.   (*Kuntz v.
Sumption*, 117 Ind. 1, 19 N. E. 474; *Dietz v. Neenah*, 91 Wis.
422, 64 N. W. 299, 65 N. W. 500; *People v. Hasbrouck*, 11
Utah, 291, 39 Pac. 918.)   The fact that the medical law of
Idaho permits the refusal of a license for conduct of a criminal
nature, and does not require that the crime be such a one as
involves moral turpitude, and does not require a previous con-
viction by any court, and does not establish what evidence shall
be sufficient to determine the question before the board, does
vest a large judicial power in the board to determine a crim-
inal act, and thereupon to deprive an  applicant of his prop-
erty right.   That the right to follow any of the common occupa-

tions of life is an inalienable right. (*Butchers' Union etc. Co. v. Crescent City etc.,* 111 U. S. 746, 4 Sup. Ct. Rep. 652; *Powell v. Pennsylvania,* 127 U. S. 678, 8 Sup. Ct. Rep. 992, 1257; *Van Slyke v. Board of Dental Examiners,* 115 Cal. 644, 48 Pac. 225.) Also violative of section 20, article 5, of the constitution of Idaho. (*McCray v. Baker,* 3 Wyo. 192, 18 Pac. 749; *Schillinger v. United States,* 155 U. S. 163, 15 Sup. Ct. Rep. 85, 39 L. ed. 108.) Wherein the statute authorizes the state medical board to refuse a license for acts of a criminal nature does not limit such act to one which necessarily affects the professional standing of the applicant, or arrives from the discharge of his duties, it therein is an *ex post facto* law within the ruling of the supreme court of the United States. (*Cummings v. Missouri,* 4 Wall. 277; *Ex parte Garland,* 4 Wall. 333.)

Attorney General Frank Martin, for the State.

The office we are now considering is one of legislative creation, and by the legislature can be modified, controlled or abolished, and within this general power is embraced the right to change the mode of appointment to the office. We have only to add, that as the legislature has the power to withdraw the authority of appointment from the governor, the mode pointed out by the act of 1854, by which inspectors under that act are to be designated and qualified, was a constitutional exercise of legislative power, and we need not say whether the inspectors under the act of 1854 are technically officers in point of law or not." (*Davis v. State,* 7 Md. 151, 61 Am. Dec. 331.) We invite and call especial attention to the decision of the supreme court of Utah in the case of *People v. Hasbrouck,* 11 Utah, 291, 39 Pac. 918, which passes on nearly all the questions raised in this application. (*Craig v. Board of Medical Examiners,* 12, Mont., 203, 29 Pac. 532; *State v. Creditor,* 44 Kan. 565; 21 Am. St. Rep. 306, 24 Pac. 346; *Harding v. People* 10 Colo. 387, 15 Pac. 727; *State v. Carey* 4 Wash. 424, 30 Pac. 729; *State v. Vanderlius,* 42 Minn. 129, 43 N. W. 789, 6 L. R. A. 119; *Hewitt v. Charier* 16 Pick. 356; *Hadderich v. State,* 101 Ind. 564, 51 Am. Rep. 768, 1

N. E. 47.)    Taking up the question that it vests judicial power in the board, we submit the following: *State ex rel Chapman v. State Board Medical Examiners etc.,* 34 Minn. 387, 26 N. W. 123. In this case the supreme court held that the power to refuse certificates to individuals guilty of unprofessional or dishonorable conduct, and the power to revoke certificates for like cause, was constitutional, and that the power to revoke such certificates was not an exercise of judicial power. (*Ex parte McNulty,* 77 Cal. 164, 11 Am. St. Rep. 257, 19 Pac. 237; *People v. Hasbrouck,* 11 Utah, 291, 39 Pac. 921; *Barmore v. Dickson,* 21 Or. 301, 28 Pac. 8; *Van Slyke v. Board of Dental Examiners,* 115 Cal. 644, 48 Pac. 222.)

QUARLES, C. J.—This is an application for a writ of habeas corpus. The petitioner, in his petition, alleges that he is unlawfully restrained of his liberty by the sheriff of Nez Perces county, under a warrant of arrest which issued out of the probate court of said Nez Perces county in which the petitioner is charged with unlawfully practicing medicine without having first procured a license, in violation of the act of March 3, 1899, commonly known as "the Medical Bill." (See Sess. Laws 1899, p. 345.) The petition shows that the petitioner made an application to the district judge of the second judicial district for a writ of habeas corpus, and which application was, by said district judge, denied. This application is based upon the idea that the said act of March 3, 1899, was and is unconstitutional and void.

It is contended on behalf of the petitioner that inasmuch as the said act authorizes and empowers the governor of this state to name and appoint a state board of medical examiners, and to fill vacancies upon said board, without the assent and concurrence of the Senate, the same contravenes section 1 of article 2 of the constitution. That section is as follows: "The powers of the government of this state are divided into three distinct departments: the legislative, executive, and judicial, and no person, or collection of persons, charged with the exercise of powers properly belonging to one of these departments shall exercise any' powers properly belonging to either of the others,

except as in this constitution expressly directed or permitted."
Section 6 of article 4 of the constitution is as follows: "The
governor shall nominate and by and with the consent of the
Senate, appoint all officers whose offices are established by this
constitution, or which may be created by law, and whose ap-
pointment or election is not otherwise provided for.  If during
the recess of the Senate, a vacancy occurs in any state or dis-
trict office, the governor shall appoint some fit person to dis-
charge the duties thereof until the next meeting of the Senate,
when he shall nominate some person to fill such office.  If the
office of a justice of the supreme or district court, Secretary
of State, state auditor, state treasurer, attorney general, or
superintendent of public instruction, shall be vacated by death,
resignation or otherwise, it shall be the duty of the governor
to fill the same by appointment, and the appointee shall hold
his office until his successor shall be elected and qualified in
such manner as may be provided by law."  The act in question
does not contravene either of said provisions of the constitution.
Section 6, article 4, *supra*, points out the manner of filling
offices whose appointment or election is not otherwise provided
for by law.  But in the act in question the legislature has
provided, as it has power to do under the constitution, for the
appointment by the governor.  The manner provided in said
medical bill for the appointment of the board does not deprive
the legislature of the power of impeachment.

It is argued, on behalf of the petitioner, that the said act
of March 3, 1899, is unconstitutional because it is provided
in the fifth section thereof that "persons who received a license
under the now defunct medical law of 1897 will simply be re-
quired to transmit such license."  It is also contended that
the said act by its terms exempts railroad surgeons, while in
the discharge of their official duties, who live in other states,
from the operation of the act while performing the duties of
surgeons or physicians temporarily in this state.  This, it is
argued, is class legislation, which makes the statute unconsti-
tutional.  It is also contended, on behalf of petitioner, that
said act is unconstitutional because it takes away from old prac-

titioners, under the law of 1887, the right to practice medicine, and it is argued that this takes a vested right—a property right—from such old practitioners, without due process of law. It is also argued, on behalf of petitioner, that under the said act of March 3, 1899, Chinese are ineligible to practice medicine, and cannot be licensed, and that therefore the act is in contravention of the constitution, and violates existing treaties between this country and China, and is therefore unconstitutional and void. It is also contended that under the provisions of said act old practitioners are required to pay five dollars for license, while those who had obtained license under the defunct medical bill of 1897 do not have to pay anything for license; and that it requires a license fee of twenty-five dollars from all applicants who are required to take an examination. For all of these reasons, it is claimed that said act of March 3, 1899, is class legislation; that it grants "special immunities to special classes"; that it violates the rule of "equality before the law." In order to fully understand the contentions made on behalf of petitioner, it is necessary to set forth *in extenso* sections 5 and 6 of said act, found on pages 346 and 347 of the Session Laws of 1899, and which are as follows:

"Sec. 5. All persons, except as hereinafter provided, who were legally engaged in the actual practice of medicine and surgery or either of them within the state, at the time of the passage of this act, under the provisions of the medical act of 1887, shall be licensed without examination to continue such practice under this act, by making application to the state medical examining board upon suitably prepared blanks to be furnished by said board, within six months from the taking effect of this act. The applicant shall be required to transmit with said application a certificate from the county recorder from the county in which he or she may reside, that said applicant is a bona fide resident of the state and has recorded his or her diploma under the provisions of the medical act of 1887, giving date of such record. Persons who received a license under the now defunct medical law of 1897 will simply be required to transmit such license. The fee for license under

this section shall be five dollars ($5) and shall in each case accompany the application. Upon fulfillment of the requirements herein stated, the board shall issue to said applicant a license to practice medicine and surgery within this state. Persons for whom the provisions of this section are intended, failing or refusing to avail themselves of the same, shall be and are hereby subject to the requirements of section 6 of this act.

"Sec. 6. After the passage of this act, every person, except as hereinafter provided, desiring to commence the practice of medicine and surgery, or either of them, within the state shall, immediately and prior to commencing the same, make a written application to the state medical examining board, upon suitably prepared blanks, to be furnished by the board, for a license so to do. The applicant shall transmit with said application his or her diploma together with an affidavit setting forth that said diploma is genuine and that the applicant is the rightful possessor and the identical person named therein, and that same was obtained by pursuing the regular course of study or examination in said institution, and setting forth that he or she is a citizen of the United States, or has declared their intention of becoming such. If the said diploma has been issued by a reputable college of medicine in good standing, said applicant shall be eligible to examination. All applicants shall be examined in the applied branches of the theory and practice of medicine and surgery or either of them, as those branches are taught in the reputable chartered schools of the system of medicine to which the applicant belongs and which the applicant intends to practice, and such examination shall in all cases include anatomy, physiology, pathology, diagnosis, hygiene, chemistry, histology and toxicology. No applicant for license shall be allowed to practice medicine and surgery or either of them until such license shall have been granted. The board shall cause the examination to be scientific and practical and sufficiently thorough to test the applicant's fitness to practice medicine and surgery or either of them and if the applicant correctly answer at least seventy-five per cent

of all the questions submitted, said board shall grant the applicant a license to practice medicine and surgery in this state. Every applicant for license under any of the provisions of this act, must furnish sufficient evidence to the board that they are of good moral character. All applications under this section must be accompanied by twenty-five dollars ($25) which is the fee for examination under this section. Should the applicant fail to pass said examination, the fee is not returnable. The cost of transmission to and from the board of all papers belonging to an applicant under this or any other section of this act shall be paid by the applicant. In the case an applicant for an examination fails to pass the required examination, he or she may be re-examined after the expiration of six months, and within one year without the payment of an additional fee, and thereafter said applicant may be examined as often as desired at any regular or special meeting of the board on the payment of the regular fee for such examination. Said board may also refuse a license, for unprofessional conduct, or conduct of a criminal, immoral, or dishonorable nature."

Under the provisions of this act, construed as a whole, any person who was at the time of the passage of the act actually engaged in the practice of medicine or surgery, or either within the state, under the provisions of the medical act of 1887 (Rev. Stats., sec. 1298 et seq.) shall be licensed without examination to continue such practice under this act by making an application to the board of medical examiners, and forwarding with his application certain evidence showing that he has filed and recorded his diploma, as required by the act of 1887, and that he is of good moral character.

We find nothing in this act which attempts to deprive anyone of a vested right. It is true that persons who are actually engaged in the practice of medicine or surgery under the laws of 1887, and persons who had acquired a license from the board under the defunct act of 1897, are not required to undergo an examination before the board of examiners under the act in question; and it is also true that such persons are only re-

quired to pay to the board a fee of five dollars, while all the other persons required to take an examination are required to pay a fee of twenty-five dollars. These provisions are not, in our opinion, open to the objection of "class legislation" or "special immunities." The act makes certain evidence prima facie sufficient to admit the applicant to license and to continue the practice of medicine and surgery, or either, without examination. This provision, and the provision requiring that the fee of five dollars should be paid, applies to all persons who stand in the same position, that is, those who under the act need not take the examination. It is not an unreasonable requirement, nor class legislation to require that those applicants who do not possess the prima facie evidence required by the statute to entitle them to license without examination pay to the board of examiners a fee of twenty-five dollars. The objection that the act, by its terms, excludes Chinese, and violates provisions in existing treaties, and is therefore unconstitutional, need not be discussed here, for the reason that, if that contention is true, it would only avoid that one provision in the act, and would not avoid the act in its entirety. There is no contention that the petitioner is a Chinaman, or is a subject of the Chinese Empire, and therefore it is unnecessary to pass upon that question in this proceeding. It is not true, as contended on behalf of the petitioner, that those who acquired a license under the defunct act of 1897 are required to pay nothing for a license under the provisions of this act. Section 5 of the act set forth *supra* expressly provides that "the fee for license under this section shall be five dollars ($5) and shall in each case accompany the application."

It is argued on behalf of the petitioner, too, that no one, under the provisions of the act in question, can take the examination and acquire license who is not a graduate of a reputable college of medicine in good standing; and that the board is made the judge of what is a reputable school of medicine, and therefore vested with judicial power, in contravention of the provisions of our constitution. We think that the provisions complained of are reasonable and a proper exercise

of the police power of the state. Similar legislative acts have so often been held to be a proper exercise of the police power of the state as to make citation of authority upon that question almost unnecessary. It has often been held that it is competent for the legislature to provide for a board who shall pass upon the competency of applicants to practice medicine and surgery. The vesting of such power in the board does not grant to it such judicial power as renders the act objectionable under the provisions of section 2 of article 5 of our constitution. The act in question, however, expressly provides that, if the medical board of examiners shall refuse an applicant a license for any reason, the applicant may have the action of the board reviewed in the district court. A careful perusal of the act in question, and of all its parts, shows a carefully guarded intent on the part of the framers of the act, and on the part of the legislature in enacting it, to protect the health and lives of the inhabitants of the state; to prevent incompetent persons from practicing medicine and surgery; and, at the same time, to work no injustice upon the part of applicants for license, recognizing the rights of the old practitioners, under the act of 1887, who were not graduates of any medical school, recognizing the rights of those who, under said act, had diplomas from medical schools, and who were actually engaged in the practice of medicine at the time of the passage of the act in question; and by providing in express terms for a review, by the courts, of the action of the state medical board in all cases in which they should refuse an applicant a license. Under the provisions of said act, all applicants must be persons of good moral character, free from criminal practices, and that they should not be convicted criminals—a wise, humane, proper, and legitimate exercise of the police power of the state. In considering the different questions raised on behalf of the application of the petitioner, a careful perusal of the following authorities, cited by the attorney general, in opposition to the granting of the writ demanded, are of peculiar interest, and shed much light upon the questions raised, to wit: *Davis v. State,* 7 Md. 151, 61 Am. Dec. 331;

*People v. Hasbrouck,* 11 Utah, 291, 39 Pac. 918; *Harding v. People,* 10 Colo. 387, 15 Pac. 727; *State v. Carey* 4 Wash. 424, 30 Pac. 729; *State v. Vandersluis,* 42 Minn. 129, 43 N. W. 789, 6 L. R. A. 119; *Hewitt v. Charier,* 16 Pick. 356; *Ex parte Spinney,* 10 Nev. 324. See, also, the case of *Dent v. West Virginia,* 129 U. S. 114, 9 Sup. Ct. Rep. 231, 32 L. ed. 625, cited by counsel for petitioner, in which Mr. Justice Field discusses at length a similar act passed by the legislature of the state of West Virginia, and holds the same to be constitutional and valid. This last case, *Dent v. West Virginia, supra,* disposes of the contention of the petitioner that the act in question contravenes the fourteenth amendment to the United States constitution.

We have carefully considered every objection to the statute raised on behalf of the petitioner, and all of the authorities cited by counsel for the petitioner, and, after a full consideration, we are fully convinced that none of the objections to the statute, so forcefully urged by learned counsel for the petitioner, are well taken, unless it be the one relating to the question of applicants who are subjects of the Chinese Empire; but this objection, for reasons hereinbefore stated, it is unnecessary to discuss or decide.

For the reason that the petition does not state facts which would justify the discharge of the petitioner upon a return to the writ, if granted, and does not show a proper case for the writ demanded, the same should be, and is hereby, denied.

Sullivan and Stockslager, JJ., concur.