## STATE *vs.* THOMAS J. HEFFERNAN.

### MARCH 2, 1917.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

*(1)    Constitutional Law.    Practice of Medicine.*

In determining the constitutionality of Gen. Laws, 1909, cap. 193, relative to the practice of medicine, the question to be determined is whether the particular qualification required by the chapter for the practice of medicine is one fit and appropriate to the medical profession and designed for the protection of the public, or is unreasonable and arbitrary.

*(2)    Constitutional Law.*

No one can take advantage of the unconstitutionality of an act who has no interest in and is not affected by it.

*(3)    Constitutional Law.    Practice of Medicine.*

Gen. Laws, 1909, cap. 193, § 3, in providing that a candidate for examination for authority to practice medicine in this State must present "satisfactory evidence of graduation from a medical school in good standing," cannot be attacked on the ground that it is unconstitutional in that it makes no provision for persons not graduates of a medical school, but who are qualified to practice medicine, where defendant does not belong to the class thus excluded and is therefore not affected by the provision.

*(4)    Constitutional Law.    Practice of Medicine.*

Gen. Laws, 1909, cap. 193, § 3, in providing that a candidate for examination for authority to practice medicine in this State must present "satisfactory evidence of graduation from a medical school in good standing," is not obnoxious to Art. I, § 10, Cons. R. I., nor to Art. XIV, § 1, of amendments to Cons. U. S., in depriving a defendant, who claims to have originated a system of medicine not taught in any school, unexplained and with apparently no followers, of the right to pursue his lawful occupation, and thus depriving him of liberty and property without due process of law, for a provision excluding one from practicing such a system must be held to be in the interest of the general welfare and to be a reasonable and proper exercise of legislative power; nor obnoxious to Cons. R. I., Art. I, § 2, requiring that "all laws should be made for the good of the whole."

*(5)    Practice of Medicine.*

Unless one was engaged in the practice of medicine on January 1, 1892, or has since passed the examination required by the Board of Health

which he was eligible to take prior to May 22, 1908, he has never lawfully practiced medicine, and therefore is, by Gen. Laws, 1909, cap. 193, § 3, deprived of no vested property right.

*(6)  Practice of Medicine.*

A new .and stricter requirement for the practice of medicine, which excludes some hitherto lawfully practicing, is not an unconstitutional exercise of legislative power.

*(7)  Practice of Medicine.*

The classification under Gen. Laws, 1909, cap. 193, § 3, of those qualified to practice medicine lawfully, into persons who, being graduates from a medical school in good standing, pass in a satisfactory manner the examination required by the State Board of Health, and persons lawfully engaged in the practice of medicine on May 22, 1908, is not in conflict, in requiring satisfactory evidence of graduation from a medical school in good standing before a candidate can be examined or be permitted to practice medicine, with either Section 10 of Article I of the Constitution of the State or Section 1 of Article XIV of the amendments to the Federal Constitution, as an unreasonable classification, nor is it in conflict with that portion of Section 2 of Article I of the Constitution of the State which requires that " all laws . . . should be made for the good of the whole."

*(8)  Practice of Medicine.  Constitutional Law.*

Where one is excluded from the practice of a profession by the terms of a statute and not by the exercise by a State Board of Health of any power given to it by the statute, he is not affected by any of the powers conferred upon the board, and therefore cannot attack the constitutionality of the portion of the statute conferring the powers.

*(9)  Practice of Medicine.  Constitutional Law.*

Gen. Laws, 1909, cap. 193, is not in conflict with either Section 10 of Article I of the State Constitution or Section 1 of Article 14 of the amendments to the Federal Constitution, in that it fails to define the " practice of medicine," since these words must be construed to relate to the practice of medicine as ordinarily and popularly understood.

*(10)  Practice of Medicine.  Constitutional Law.  Ex Post Facto Law.*

An objection to the constitutionality of Gen. Laws, 1909, cap. 193, relative to the practice of medicine, that it is in effect an *ex post facto* law, because its prohibitions vary from time to time as medical science progresses and as the personnel of the court changes, cannot be raised by a defendant who does not show that he has been affected in the respects alleged.

*(11)  Constitutional Law.  Ex Post Facto Law.*

Art. I, § 10, of the Federal Constitution, " No State shall . . . pass any . . . *ex post facto* law," is a restraint upon legislative power, and concerns the making of laws, not their construction by the courts.

(*12*)  *Practice of Medicine.  State Board of Health.  Constitutional Law.*

Gen. Laws, 1909, cap. 115, "Of the State Board of Health," is not obnoxious to Cons. R. I., Art. 1, § 2, "All laws . . . should be made for the good of the whole," in providing that at least four of seven members shall be members of some medical society incorporated by the State, nor is it in conflict with Cons. R. I., Art. 1, § 10, nor with Cons. U. S. Art. 14, § 1, of amendments, in that it is legislation for a class and not for the public welfare, for under Chapter 115 the duties of the State Board of Health do not include any relating to the regulating of the practice of medicine, and the practitioners of every school of medicine in the State, if they number as many as five, may form a medical society under the general laws and be eligible for appointment to the board.

(*13*)  *Constitutional Law.  Practice of Medicine.*

Even if Gen. Laws, 1909, cap. 193, § 3, "Of the Practice of Medicine," were open to the objection of unconstitutionality as to the grant of power to the State Board of Health to examine candidates for the practice of medicine and to issue or withhold certificates, this would not affect the validity of Gen. Laws, 1909, cap. 115, "Of the State Board of Health," in any respect.

CRIMINAL COMPLAINT.   Certified on constitutional questions.

BAKER, J.   This case comes before this court on certification from the District Court of the Sixth Judicial District for the determination of certain constitutional questions raised by the defendant in his special plea in bar.

The defendant was arrested on a warrant dated November 6, 1912, issued on the complaint of Gardner T. Swarts, Secretary of the State Board of Health, charging that the defendant " did open an office with intent to practice medicine, and did hold himself out to the public as a practitioner of medicine by appending to his name the title ' doctor,' and an abbreviation thereof, to wit, ' Dr.,' and by appending to his name the title of ' Neuzopathic Physician,' also by appending to his name the title of ' Neuzopath,' and by representing that he was versed in and willing to practice for compensation the art of preventing, curing and alleviating disease and pain, and did

attempt to and did practice medicine and surgery after having received therefor, and with intent to receive therefor, directly and indirectly, a bonus, gift and compensation, said defendant not being then and there legally authorized to practice medicine within this State, and not being then and there registered to practice medicine according to law.''

On arraignment the defendant pleaded not guilty, but thereafter was permitted to withdraw his plea and to demur to the complaint. His demurrers being overruled, he thereupon filed a special plea in bar wherein he sets forth '' that although he may be competent to practice a system or systems of medicine, and although he has been and is willing to be examined as to his qualifications by a board of examiners legally constituted, according to the provisions of any law of this State which is not in conflict with the Constitutions of the State of Rhode Island or of the United States, nevertheless, it is impossible for him to conform to the requirements of the statutes in such case made and provided, for the reason that the said Thomas J. Heffernan is not a graduate of any college or school of medicine; that the system of medicine or therapeutics in which he has always been willing to be examined was originated by the said Thomas J. Heffernan, and said system is not taught in any school or college of medicine, so that it is impossible for the defendant to present to the State Board of Health satisfactory evidence of graduation from any college or school of medicine. Thus the said defendant is forbidden by statute to practice a system originated by himself or any other system included in the complaint and warrant, unless he has graduated from a college or school of mdeicine. ' For this and for other reasons to be pointed out herewith the said Thomas J. Heffernan says that Chapters 193 and 115 of the General Laws of the State of Rhode Island are unconstitutional, being in violation of the provisions of the

Constitutions of the State of Rhode Island and of the United States in making it impossible for the said defendant to pursue his lawful occupation, and he specifies his objections as follows: '' stating ten different specifications wherein said chapters are unconstitutional. The first five charge that Section 3 of Chapter 193 of the General Laws is unconstitutional, and the fourth and fifth make a similar claim as to Section 5 of the same chapter. The sixth, seventh and tenth specifications allege that Chapter 193 in its entirety is unconstitutional. The eighth alleges that Chapter 115 of the General Laws is unconstitutional and particularly Section 1 thereof; the ninth makes the same charges as to said Section 1.

Such portion of Section 3 of Chapter 193 as it becomes necessary to consider is as follows: '' Sec. 3. Authority to practice medicine under this chapter shall be a certificate from the State Board of Health; and said board shall, upon application, after examination, issue a certificate to any reputable physician who intends to practice medicine or surgery in this State, who presents satisfactory evidence of graduation from a medical school in good standing, and who shall present himself before the State Board of Health and pass in a satisfactory manner such examination as said board may require: *Provided, however,* that the provisions of this section shall not apply to any person lawfully engaged in the practice of medicine or surgery in this State on the twenty-second day of May, nineteen hundred and eight.''

The first specification of unconstitutionality contained in defendant's special plea is in the following words and figures: '' 1. Section 3 of Chapter 193 of the General Laws, which says that any person must present satisfactory evidence of graduation from a college or school of medicine in good standing before he will be permitted to take an examination to practice medicine, is unconstitutional because it is in conflict with Section 2 and Section

10 of Article I of the constitution of the State of Rhode Island, and with Section 1 of Article 14 of the Amendments to the Constitution of the United States in this: Section 3 of said Chapter 193 prohibits persons from qualifying to practice medicine and surgery who are not graduates of a college or school of medicine, and makes no provision for persons who are not graduates of such schools or colleges but who are qualified to practice medicine, nor does it make any provision for persons who desire to practice a system of medicine which is not taught by any school or college. Said Section of said Chapter is not therefore made for the benefit of the whole people as required by Section 2 of Article 1 of the Constitution of Rhode Island; said Section 3 of said Chapter deprives this defendant of the right to pursue his lawful occupation, and thus deprives him of his liberty and property without due process of law."

It is apparent that the provision in Section 3 of Chapter 193 that a candidate for examination must present " satisfactory evidence of graduation from a medical school in good standing " makes such graduation a qualification essential to the lawful practice of medicine or surgery within this State by anyone not thus in practice on May 22, 1908, and in effect excludes all persons without this qualification from such examination. This statutory bar to the practice of medicine by the defendant raises the important question in this case. The defendant in his plea admits his lack of this qualification, but claims that the statute is invalid in that it deprives him of his constitutional rights.

Section 2 of Article I of the Constitution of Rhode Island is as follows: " Sec. 2. All free governments are instituted for the protection, safety and happiness of the people. All laws, therefore, should be made for the good of the whole; and the burdens of the state ought to be fairly distributed among its citizens."

The defendant in his brief quotes the portion of Section 10 of Article I of the State Constitution with which he deems Section 3 of Chapter 193 in conflict, as follows: "... nor shall he be deprived of life, liberty, or property, unless by the judgment of his peers, or the law of the land;" and that portion of Section 1 of Article XIV of the Amendments of the Constitution of the United States, with which said Section 3 is claimed to conflict as follows: "... No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

The defendant apparently does not question the authority of State legislative bodies to regulate in some manner and to a certain extent the practice of medicine, as in his brief he states that "Statutes regulating the practice of medicine have been passed in all the states and have generally been upheld as being valid police regulations to protect the public health." His claim, however, is that in Chapters 115 and 193 the General Assembly has exceeded its constitutional powers. This legislative authority to enact such statutes and the right on which it rests are well stated in State v. Vandersluis, 42 Minn. 129, as follows: "That the legislature may prescribe such reasonable conditions upon the right to practice medicine or law as will exclude from the practice those who are unfitted for it, is so well settled by decisions of the courts as to be no longer an open question. The power rests on the right to protect the public against the injurious consequences likely to result from allowing persons to practise those professions who do not possess the special qualifications essential to enable the practitioner to practise the profession with safety to those who employ him." ... "The only limit to the legislative

power in prescribing conditions to the right to practise in a profession is that they shall be reasonable. Whether they are reasonable,— that is, whether the legislature has gone beyond the proper limits of its power,— the courts must judge. By the term ' reasonable ' we do not mean expedient, nor do we mean that the conditions must be such as the court would impose if it were called on to prescribe what should be the conditions. They are to be deemed reasonable where, although perhaps not the wisest and best that might be adopted, they are fit and appropriate to the end in view, to wit, the protection of the public, and are manifestly adopted in good faith for that purpose. If a condition should be clearly arbitrary and capricious; if no reason with reference to the end in view could be assigned for it; and, especially, if it appeared that it must have been adopted for some other purpose,— such, for instance, as to favor or benefit some persons or class of persons,— it certainly would not be reasonable, and would be beyond the power of the legislature to impose.''

*Dent* v. *West Virginia,* 129 U. S. 114, is a leading case in this branch of the law. In referring to the right of a citizen to follow any calling and the limitations upon the exercise of this right by a state the court says, on page 121: '' It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex and condition. This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution.'' . . . '' But there is no arbitrary deprivation of such right where its exercise is not permitted because of a failure to comply with

conditions imposed by the state for the protection of society. The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity as well as of deception and fraud. As one means to this end it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely, their possession being generally ascertained upon an examination of parties by competent persons, or inferred from a certificate to them in the form of a diploma or license from an institution established for instruction on the subjects, scientific and otherwise, with which such pursuits have to deal. The nature and extent of the qualifications required must depend primarily upon the judgment of the state as to their necessity. If they are appropriate to the calling or profession, and attainable by reasonable study or application, no objection to their validity can be raised because of their stringency or difficulty. It is only when they have no relation to such calling or profession, or are unattainable by such reasonable study and application, that they can operate to deprive one of his right to pursue a lawful vocation.

Few professions require more careful preparation by one who seeks to enter it than that of medicine. It has to deal with all those subtle and mysterious influences upon which health and life depend, and requires not only a knowledge of the properties of vegetable and mineral substances, but of the human body in all its complicated parts, and their relation to each other, as well as their influence upon the mind. The physician must be able to detect readily the presence of disease, and prescribe appropriate remedies for its removal. Every one may have occasion to consult him, but comparatively few can

judge of the qualifications of learning and skill which he possesses. Reliance must be placed upon the assurance given by his license, issued by an authority competent to judge in that respect, that he possesses the requisite qualifications. Due consideration, therefore, for the protection of society may well induce the State to exclude from practice those who have not such a license, or who are found upon examination not to be fully qualified. The same reasons which control in imposing conditions, upon compliance with which the physician is allowed to practice in the first instance, may call for further conditions as new modes of treating disease are discovered, or a more thorough acquaintance is obtained of the remedial properties of vegetable and mineral substances, or a more accurate knowledge is acquired of the human system and of the agencies by which it is affected."

Other cases of a similar import might be cited, but these two sufficiently state in a general way the rules by which the constitutionality of such statutes is to be determined. The question is whether the particular qualification required by Chapter 193 for the practice of medicine is one fit and appropriate to the medical profession and designed for the protection of the public, or is unreasonable and arbitrary. This court has said that " The object of the statute in question is to secure the safety and protect the health of the public." *State* v. *Mylod,* 20 R. I. 632, 643. The defendant states several grounds in support of his claim of unconstitutionality, but before discussing any of them it is well to note a well-recognized restriction on the power to raise such questions. In *State* v. *Snow,* 3 R. I. 64, 75, this court said: "And it is a rule, and a very wholesome rule, that no one can take advantage of the unconstitutionality of an act, who has no interest in, and is not affected by it." In *Southern Railway Co.* v. *King,* 217 U. S. 524, 534, it is stated " that one who would strike down a state statute as

violative of the Federal Constitution must bring himself by proper averments and showing within the class as to whom the act thus attacked is unconstitutional. He must show that the alleged unconstitutional feature of the law injures him, and so operates as to deprive him of rights protected by the Federal Constitution." See, also, *Sayles* v. *Foley,* 38 R. I. 484, and cases cited on page 490, 6 R. C. L., Sec. 87 *et seq.,* Constitutional Law.

The first specification of unconstitutionality states two grounds therefor, one, in that it " makes no provision for persons who are not graduates " of a medical school, " but who are qualified to practice medicine; " the second, in that it makes no " provision for persons who desire to practice a system of medicine which is not taught by any school or college." If the first ground be interpreted to mean simply that the statute excludes from practice persons otherwise qualified and able to " pass in a satisfactory manner such examination as " the State Board of Health " may require," because they are not graduates of a medical school, it is evident from the special plea in bar that the defendant does not claim to belong to the class thus excluded. He does not profess to be qualified or able to pass such examination, and evinces (3) no desire to take it. As he does not belong to the class excluded on this first ground, he is not affected by it and can, therefore, as already appears, raise no question as to unconstitutionality on that ground. He does bring himself within the class affected by the statute on the second (4) ground, namely, those persons excluded from the practice of medicine, who desire to practice a system of medicine not taught in any medical school. In his special plea in bar the defendant says that " he has always been willing to be examined " in a " system of medicine or therapeutics " originated by himself and "not taught in

any school or college of medicine." This raises a ques-
tion which he is entitled to have considered.

It might naturally be expected from the nature of
things that the "healing art" would early be in evi-
dence. This appears to have been the fact. History
shows that that there was a practice of medicine in some
form by the Egyptians and Greeks centuries before the
beginning of the Christian era. Books and treatises on
medicine and its practice were written at an early date
and in time its practice was recognized as a distinct art.
In *Bragg* v. *State*, 134 Ala. 165, 58 L. R. A. 925, the court
traces in a general way the history and development of
the medical profession which may be examined by those
interested therein. See, also, *State* v. *Biggs*, 133 N. C.
729, 737. This brief reference to these cases will suffice
for our present purpose without quoting therefrom.
While undoubtedly in stages of its history the practice
of medicine has been to some extent empirical, it is safe
to say as a matter of common knowledge that a vast
amount of accurate information has now been accumu-
lated as to the structure of the human body, as to the
functions of its various parts, as to the diseases to which
it is subject or exposed and as to the discovery and use
of remedies for the prevention and cure of disease, and
that this information is included in the subjects of study
in medical schools. It is also a matter of common knowl-
edge that by increased facilities for research and experi-
ment in laboratory by men scientifically trained within
the last few years, great advances have been made in a
more intelligent and successful practice of medicine and
surgery. It is of these and kindred subjects that the
person seeking permission to practice medicine is re-
quired by our law to have knowledge. In *State* v. *Mylod*,
20 R. I. 632, 637, in discussing the meaning of the words
"practice of medicine" in the statute the court said:
"The practice of medicine, as ordinarily or popularly

understood, has relation to the art of preventing, curing, or alleviating disease or pain. It rests largely in the sciences of anatomy, physiology, and hygiene; it requires a knowledge of disease, its origin, its anatomical and physiological features, and its causative relations; and, further, it requires a knowledge of drugs, their preparation and action. Popularly it consists in the discovery of the cause and nature of disease, and the administration of remedies or the prescribing of treatment therefor." While doubtless there is a difference in the different schools of medicine as to the remedial measures to be employed in the treatment of disease, nevertheless an accurate knowledge of the human body, of the functions of its organs and parts, and of the diseases to which it is subject must furnish the foundation of medical practice in all schools of medicine. The defendant does not seek an examination in these matters, but says he has originated a system of medicine or therapeutics not taught in any school of medicine, in other words, that he has originated a new method for the discovery, prevention and treatment of disease. It may perhaps be inferred that he is the only practitioner under the system thus originated, and that there is no one qualified to examine him in it. There is no suggestion that defendant's system of medicine has ever been explained or submitted for examination to anyone or has ever been committed to print so that it may be examined or studied by others. A system thus unexplained with apparently no followers is scarcely worthy to be dignified by calling it a school of medicine. In these circumstances, while recognizing that progress in the discovery of the causes of disease and of its prevention is probably now being made, we think it is outside of all reasonable probability that the defendant has discovered such a large field of medical knowledge, hitherto unexplored by any student, investigator or practitioner of medicine, as to permit him

to originate a new system of medicine or therapeutics. In our judgment it is so utterly improbable, that a legislative provision which excludes one from practicing such a system upon his fellowmen must be held to be in the interest of the general welfare and to be a reasonable and proper exercise of legislative power.

The defendant urges that he is deprived of pursuing his lawful occupation as if he had lawfully hitherto practiced medicine, and had by Chapter 193 been deprived of a vested property right. But unless he was engaged in the practice of medicine on January 1, 1892, or has (5) since passed the examination required by the Board of Health, which he was eligible to take prior to May 22, 1908, he has never lawfully practiced medicine, and, therefore, is by the act deprived of no vested property right. Moreover it has been held that a new and stricter requirement for the practice of medicine, which excludes some hitherto lawfully practising, is not an unconstitutional exercise of legislative power. See *Dent* v. *West Virginia, supra; State* v. *Vandersluis, supra; Meffert* v. *Medical Board,* 66 Kan. 710, 718; *Reetz* v. *Michigan,* 188 (6) U. S. 505, 510; *Collins* v. *Texas,* 223 U. S. 288, 297, and 6 R. C. L., Sec. 252, Constitutional Law. In the present case the qualification of a medical school graduation as a prerequisite for examination for permission to practice medicine which is " imposed upon all persons of like age, sex and condition " is not an unreasonable or arbitrary one under the doctrine of the cases first cited herein, nor does it operate as a deprivation of the right of the defendant to follow the medical profession. It is open to him as to others to qualify himself therefor. Once admitted, he would have opportunity to use in a proper way such medical discoveries as he may actually have made.

(7) Section 3 of Chapter 193 recognizes two classes qualified to practice medicine lawfully, namely, those who,

being graduates from a medical school in good stand-
ing, pass in a satisfactory manner the examination re-
quired by the State Board of Health, and those lawfully
engaged in the practice of medicine or surgery in this
State, May 22, 1908. The clause at the end of Section 1
of the Fourteenth Amendment to the Federal Constitu-
tion referring to " the equal protection of the laws "
governs classification in legislation. The classification
must be reasonable under the circumstances. See *Sayles*
v. *Foley, supra,* and cases cited on pages 491 and 492 of 38
R. I. on this point. The defendant urges that he is denied
" the equal protection of the laws " without in terms at-
tacking the classification made by Chapter 193 or pointing
out in what respect otherwise he is denied such protection.
A similar classification has been held constitutional in
*Watson* v. *Maryland,* 218 U. S. 173, 176; *Williams* v. *The
People,* 121 Ill. 84; *Scholle* v. *State,* 90 Md. 729; *Ex
Parte Whitley,* 144 Cal. 167, 178; *Fox* v. *Territory,* 2
Wash. Ter. Rep. 297, 301; *State* v. *Creditor,* 44 Kan. 565,
568. Accordingly, we do not find that the provision of
Section 3 of Chapter 193, which requires " satisfactory
evidence of graduation from a medical school in good
standing " before a candidate can be examined or be per-
mitted to practice medicine, is in conflict with either Sec-
tion 10 of Article I of the Constitution of the State or
Section 1 of Article XIV of the Amendments to the Fed-
eral Constitution. Nor is it in conflict with that portion
of Section 2 of Article I of the Constitution of the State
which requires that " all laws . . . should be made
for the good of the whole." In the *Matter of Dorrance
Street,* 4 R. I. 230, at page 249, the court, referring to this
entire section, says it sets " forth principles of legisla-
tion rather than rules of constitutional law — addressed
rather to the General Assembly by way of advice and
direction, than to the courts by way of enforcing restraint
upon the law-making power." This comment is pecu-

liarly applicable to the parts of the section quoted by the defendant in the present case. And on what ground can it be claimed that a reasonable exercise by the State of its power to provide for the general welfare of its people to secure them against the consequences of ignorance and incapacity is not made for the " good of the whole? " We discover none.

There are many cases in which the constitutionality of a statutory provision requiring the production of a diploma from a school in good standing as preliminary to practicing the profession has been upheld — some in dentistry and others in the medical profession. As for example, *Dent* v. *West Virginia, supra; State* v. *Vandersluis, supra; Scholle* v. *State, supra; Kettles* v. *People,* 221 Ill. 221; *Gothard* v. *People,* 32 Col. 11; *Fox* v. *Territory, supra; State* v. *Creditor, supra; People* v. *Phippin,* 70 Mich. 6.

We are of the opinion that specification 2 raises no constitutional question, but simply a question as to the interpretation of the words " reputable physician." Whatever their meaning, it does not appear in the present case that they in any way are the cause of the defendant's exclusion from practice, or that they affect him.

(8)   Specifications 3, 4 and 5 relate to the powers of the State Board of Health and charge the delegation of arbitrary powers, and legislative and judicial powers to the board. Inasmuch as the defendant is excluded from practice by the terms of the law itself, that is, by direct act of the legislature, and not by the exercise of the board of any power given to it, he is not affected by any of the powers conferred upon the board and, therefore, as already appears, he cannot raise questions as to the constitutionality of the portions of Section 3 of Chapter 193 which confer these powers. Specification 6 charges that

(9) Chapter 193 conflicts with Section 10 of Article I of the State, and Section 1 of Article XIV of the Amend-

ments to the Federal Constitution in that it fails to define the " practice of medicine."

As has heretofore appeared, this court in *State* v. *Mylod, supra,* held that the words " practice of medicine " must be construed to relate to the practice of medicine as ordinarily and popularly understood. On page 637 of 20 R. I. the court discusses the rule of construction to be followed and reaches the result already stated, summed up in this sentence, " Popularly it " (the practice of medicine) " consists in the discovery of the cause and nature of disease, and the administration of remedies or the prescribing of treatment therefor." This interpretation was reaffirmed in *Swarts* v. *Siveny,* 35 R. I., 1, 7. While the defendant has called our attention to several cases in discussing this specification, we think none of them sustains his claim. We do not find that Chapter 193 is in conflict with either the State or Federal Constitution as alleged in the specification. From some of the cases cited it seems as if defendant's counsel had in mind and was considering the question of the sufficiency of a criminal complaint charging one with the unlawful " practice of medicine " without other description of the offence, and was urging that such complaint does not satisfy the requirements of Section 10 of Article I of our constitution as to informing the accused " of the nature and cause of the accusation." The specification, however, does not raise the constitutional sufficiency of the complaint which was the question in *State* v. *Murphy,* 15 R. I. 543, where the form of complaint was prescribed by the statute. That also was the question in *State* v. *Carey,* 4 Wash. 424, 430. The statute of that State specifies certain things, as constituting the practice of medicine, as does Section 8 of our Chapter 193. The Washington court clearly implies that if the complaint had defined the offence as described in the statute (as the complaint in the present case does) it would have been held good.

Specification 7 charges that Chapter 193 is in effect an *ex post facto* law and thus in conflict with Section 12 of (10) Article I of the State Constitution and with Section 10 of Article I of the Federal Constitution because " What is forbidden varies from time to time as medical science progresses and also varies with the personnel of the court." If this were to be conceded to be true in a limited sense, we do not see that the defendant in the present case has actually been so affected by any change in interpretation that he' can raise the constitutional question suggested. It does not appear that the changes in the personnel of this court have effected any changes in the interpretation of the law, and to say that since the passage of the act the words " the practice of medicine " have acquired a meaning essentially unlike their original meaning seems no more than the making of a guess. We think he should show that he has been actually affected in the respects alleged and not simply a possibility that he may be so affected at some time or other, in order to raise such question. But in this connection it will not be amiss to call attention to the recent case of *Ross* v. *Oregon,* 227 U. S. 150, in which the court referring to the *ex post* (11) *facto* clause in said Section 10 of Article I of the Federal Constitution said, " but that provision of the Constitution, according to the natural import of its terms, is a restraint upon legislative power and concerns the making of laws, not their construction by the courts. It has been so regarded from the beginning."

Specifications 8, 9 and 10 may be said in general terms to allege the unconstitutionality of Chapter 115 of the (12) General Laws, and as resulting therefrom 'the unconstitutionality of Chapter 193. While perhaps it may be argued that inasmuch as by the express terms of Section 3 of Chapter 193 the defendant is excluded from the right to practice medicine because he is not a graduate from a medical school and is not excluded by any act of the State

Board of Health, he is in no way affected by the fact of whether or not the board is legally constituted in conformity with the two constitutions and, therefore, is not entitled to raise the questions contained in these three specifications. Without deciding this suggested question, inasmuch as the criminal complaint in the present case was instituted by the secretary of the board elected under and by authority of Chapter 115, and as the broad question raised is important and far reaching in its effect, the constitutional question or questions will now be considered. To refer to the matter with greater particularity, specification 8 is that Chapter 115, and especially Section 1 thereof, is in conflict with Section 2 of Article I of the State Constitution " and is made for the benefit of a class of persons and not for the whole people " in that at least four of seven members of the State Board of Health must be members of some medical society incorporated in this State, which societies, it is alleged, are " organized among other purposes to suppress new and rival systems of medicine, and to promote the general welfare of their members against competition from schools of medicine other than the two schools to which the members of said society must belong." The ninth specification alleges a conflict of Section 1 of Chapter 115 with Section 10 of Article I of the State Constitution and Section 1 of Article XIV of the Amendments to the Federal Constitution in that the right of the defendant to practice medicine is to be determined by a board selected from a private society and not from the whole people, thus abridging his privilege and depriving him of liberty and property without due process of law, and denying him the equal protection of the laws. Specification 10 charges that Chapter 193 is in conflict with Sections 2 and 10 of Article I of the State Constitution and Section 1 of Article XIV of the Amendments to the Federal Constitution in this that the right to practice medicine is to be de-

termined I a State Board of Health created by a void and uncon .tutional act, in consequence of which Chapter 193 is unc( istitutional because all the rights and obligations thereunder are wholly dependent upon the existence of a board created in an unconstitutional manner. It is evident that the basic fact underlying all these allegations of unconstitutionality is the provision that a majority of the board must be selected from the " members of some medical society incorporated by the State."

The provisions of Section 1 of Chapter 115 objected to are, " There shall be a State Board of Health which shall consist of seven persons, two from the county of Providence, one from each of the other counties, and one from the state at large. At least four members of said board shall be well-educated physicians, and members of some medical society incorporated by the state."

The members of the board are appointed by the Governor, with the advice and consent of the Senate for a term of six years each. Their duties in general are set forth in Section 2 of Chapter 115, as follows: " The board shall take cognizance of the interests of life and health among the citizens of the state; they shall make investigations into the causes of disease, and especially of epidemics and endemics among the people, the sources of mortality and the effects of localities, employments, conditions and circumstances on the public health, and shall do all in their power to ascertain the causes and the best means for the prevention of diseases of every kind in the state. They shall publish and circulate, from time to time, such information as they may deem to be important and useful for diffusion among the people of the state, and shall investigate and give advice in relation to such subjects relating to the public health, as may be referred to them by the General Assembly, or by the Governor when the General Assembly is not in session."

Section 3 requires them to investigate the subject of diseases among cattle or other animals, and their duties also have been enlarged by subsequent enactments. See Chapters 386, 728, 1070 and 1226 of the public Laws. See, also, General Laws (1909), Chapter 113, Section 4, Chapter 114, Sections 13, 14, 15, Chapter 116, Chapter 121, Sections 20 to 23, Chapter 276, Section 7, Chapter 356, Sections 30 to 32.

The board was established by Public Laws, Chapter 680, passed at the January Session, 1878. It was then composed of six persons, three of whom were required to be " well educated physicians and members of some medical society incorporated by the State." From the beginning their duties included those set out in Sections 2 and 3 of Chapter 115, *supra*. Prior to the passage of Chapter 680 the several town councils and boards of aldermen were *ex officio* boards of health in their respective towns and cities. The creation of the State Board of Health did not divest the local boards of their powers and it may reasonably be inferred that the former was expected to coöperate with and to supplement the activities of the latter. By Chapter 794, passed January, 1880, the board was authorized " to elect a well-qualified physician as their secretary," who became *ex officio* a member of the board, although since January, 1915, he has not been such member. He was not by statute required to be a member of any medical society. By Chapter 1519, passed March, 1908, Section 1 of Chapter 96 of the General Laws (1896) was amended to read as Section 1 of Chapter 115 of the General Laws of 1909 now reads. The situation from time to time has been this: from 1878 to 1880 of the board of six, three were required to be physicians who were members of a medical society of the State; from 1880 to 1908 the board consisted of seven members, four of whom were required to be physicians, three of them members of a state medical society; from

1908 to 1915 the board consisted of eight members, five of them physicians, four of whom were required to be members of a state medical society; and since 1915 seven members have composed the board, four of whom are to be physicians who are members of a medical society. An examination of the defendant's brief, in discussing Chapter 115, discloses no objection to the act creating the State Board of Health, because for the most of the thirty-eight years since its passage the provision has been that the majority of the members must be physicians. An inspection of the act itself and the various amendments thereto setting forth the powers and duties of the board relative to the measures to be taken for 'the prevention and spreading of disease and for the guarding of the public health would seem to put it beyond discussion that a majority of the board ought to be men trained to deal with such matters. The provision that such majority should be physicians is, therefore, in our opinion a reasonable exercise of legislative power. The real objection is to the requirement that the physicians must be " members of some medical society incorporated by the State," in that it is legislation for a class, and not for the public welfare, and is thus obnoxious to the State and Federal Constitutions. It is to be borne in mind that in 1878, when the State Board of Health was created and long after, that is, until 1895, there was in Rhode Island no statute regulating the practice of medicine or defining the qualifications of a practitioner. The term " physicians " was used in the statutes and certain duties were imposed on them, but any man, irrespective of whether or not he had prepared himself therefor might practice medicine, if he could find people willing to trust their health and lives to his head and hands. Under such conditions it might be expected to be and undoubtedly was the fact that some poorly educated and ill-trained, but well-meaning men, and some unscrupulous pretenders and quacks

were practicing medicine and were popularly classed as physicians.

Prior to 1878 charters had been granted to three medical societies and no question is made as to their previous incorporation and to their existence in 1878. The first was the Rhode Island Medical Society. The act was passed in February, 1812, and names forty-six incorporators, and their names would indicate that they represented the different portions of the State. The preamble to the act is as follows: "As the medical art is important to the health and happiness of society, every institution calculated to further its improvement, is entitled to public attention; and as medical societies, formed on liberal principles, and encouraged by the patronage of the laws, have been found conducive to this end: Be it therefore enacted," &c. Section 7 of the act is as follows: " The president and members of said society or such officers or members as they shall appoint for that purpose shall have full power and authority to examine all candidates for the practice of physic and surgery (who shall offer themselves for examination) respecting their skill in their profession; and if upon examination said candidates shall be found skilled in their profession and fitted for the practice of it they shall receive the approbation of the society in letters testimonial under the seal of said society, signed by the president, or such other person or persons as shall be appointed for that purpose."

At the October session in 1827 the Rhode Island Central Medical Society was incorporated, nineteen persons being named as corporators. Its Section 7 is in effect the same as Section 7 just quoted from the earlier charter. The Rhode Island Medical Reform Society was incorporated at the October session of 1854 (p. 36). Its preamble runs thus: " Whereas certain persons have associated themselves together, for the purpose of aiding and encouraging the medical reform practice, which excludes in

a great measure the use of the lancet, and also the use of mercury and antimony and have petitioned this assembly to grant them a charter of incorporation, with the privileges and powers following: '' This charter contains no provision similar to Section 7 of the last two charters. By an act of amendment passed at the January Session, 1872 (p. 207) the name of this corporation was changed to Rhode Island Liberal Medical Association and the preamble of the original act was made to read: '' Whereas certain persons have associated themselves together for the purpose of mutual improvement and protection in the practice of medicine and surgery, and have petitioned,'' etc.

The first two charters provide for the election of '' suitable persons '' as members by a majority of those present at any legal meeting. The expression '' suitable '' implies that membership in the two older societies called for qualifications of some kind. We think this is also implied in the amended preamble of the third society in the words '' associated . . . for mutual improvement and protection in the practice of medicine and surgery.'' The provision of Section 7 giving authority '' to examine all candidates for the practice of physic and surgery (who shall offer themselves for examination) respecting their skill in their profession '' and to issue letters testimonial to those '' found skilled in their profession '' is a recognition by the General Assembly of qualifications on the part of the society officials to examine candidates and to determine their skill in the profession. This section seems to point to an effort to improve and in a mild way to standardize the practice. The examinations were wholly voluntary and the testimonial was an endorsement of fitness in practice, which would be of such value to the holder as the public might give to it. In the light of all the surrounding circumstances it does not seem unreasonable to presume that at least a

great majority of the more eminent, skillful and experienced practitioners of medicine would be members of these societies, and that most of the poorly trained, unskillful and ignorant practitioners would not be included in such membership.   In other words membership in such societies would afford to a certain extent a test of professional standing and ability in that at least the quacks and those least qualified for practice would not be found in them.   Having regard to the prevailing conditions and the objects to be accomplished, was the requirement of the original act that the physicians on the board should be " members of a medical society " in the State reasonable or arbitrary and capricious?   We have hereinbefore referred to the rule governing classification with citation of cases from the Supreme Court of the United States illustrative of the application of the rule.   It is sufficient to say that the reasonable inference is that the General Assembly was providing for the selection of physicians likely to be competent for the duties assigned them as members of the board, and named membership in a medical society as a qualification, because it tended to ensure competency.   Our attention is called in the brief for the State to the fact that since 1878 eight medical societies have been incorporated in this State, five by special act and three under the general corporation law passed in 1896.   Inasmuch as that law now requires but five persons to form such a society, it is plain that any school of medicine in the State having as many as five members may form such a medical society, and its members thus become eligible for appointment to the Board of Health, if they also be " well-educated physicians," As under Chapter 115 the duties of the State Board of Health do not include any relating to the regulating of the practice of medicine, and as by legislative enactment since 1878 the list of eligibles for appointment to the

board as physicians may now include practitioners in the State of every school of medicine, if they number as many as five, we think there is no sufficient ground for the claim that Section 1 of Chapter 115 was passed not in the interest of the public welfare but for the benefit of a particular class. The history of the origin and development of this legislation indicates a legislative intent the reverse of that claimed by the defendant.

(13) We find no ground for holding Chapter 115 and especially Section 1 in conflict in any respect with either the State or Federal Constitutions. The defendant's allegation of the unconstitutionality of the State Board of Health really rests on the grant of the power to it to examine candidates for the practice of medicine and to issue or withhold certificates, as such power is conferred by Chapter 193 and particularly Section 3 thereof. But even if Section 3 of Chapter 193 or the whole chapter were open to this objection of unconstitutionality as to this grant of power, it would not affect the validity of Chapter 115 in any respect. And as to whether the powers conferred upon the State Board of Health by said Section 3 are valid or not, as already pointed out, the defendant is not in a position to question, as he has been in no particular affected by any act of the board. In his failure to apply to the board for an examination and for the issuance of a certificate, the defendant recognizes that his exclusion from practice is due entirely to the provision of the law requiring, as a necessary qualification for practice, " satisfactory evidence of graduation from a medical school in good standing." The validity of that provision we have already considered.

We are of the opinion that none of the objections properly raised by the defendant to the constitutionality of Chapter 193 and especially Section 3 thereof are well founded and valid.

The papers in the case will be sent back to the District Court of the Sixth Judicial District with our decision certified thereon for further proceedings.

*Comstock & Canning,* for State.

*Patrick P. Curran,* of counsel.

*Thomas L. Heffernan,* for defendant.