# DENT v. WEST VIRGINIA.

ERROR TO THE SUPREME COURT OF APPEALS OF THE STATE OF WEST VIRGINIA.

No. 119. Submitted December 11, 1888. — Decided January 14, 1889.

The statute of West Virginia (§§ 9 and 15, chapter 93, 1882) which requires every practitioner of medicine in the State to obtain a certificate from the State Board of Health that he is a graduate of a reputable medical college in the school of medicine to which he belongs; or that he has practised medicine in the State continuously for ten years prior to March 8, 1881; or that he has been found upon examination to be qualified to practise medicine in all its departments, and which subjects a person practising without such certificate to prosecution and punishment for a misdemeanor, does not, when enforced against a person who had been a practising physician in the State for a period of five years before 1881, without a diploma of a reputable medical college in the school of medicine to which he belonged, deprive him of his estate or interest in the profession without due process of law.

The State, in the exercise of its power to provide for the general welfare of its people, may exact from parties before they can practise medicine a degree of skill and learning in that profession upon which the community employing their services may confidently rely; and, to ascertain whether they have such qualifications, require them to obtain a certificate or license from a Board or other authority competent to judge in that respect. If the qualifications required are appropriate to the profession, and attainable by reasonable study or application, their validity is not subject to objection because of their stringency or difficulty.

Legislation is not open to the charge of depriving one of his rights without due process of law, if it be general in its operation upon the subjects to which it relates, and is enforceable in the usual modes established in the administration of government with respect to kindred matters; that is, by process or proceedings adapted to the nature of the case, and such is the legislation of West Virginia in question. *Cummings* v. *Missouri*, 4 Wall. 277, and *Ex parte Garland*, 4 Wall. 333, examined and shown to differ materially from this case.

THE court stated the case as follows:

This case comes from the Supreme Court of Appeals of West Virginia. It involves the validity of the statute of that State which requires every practitioner of medicine in it to obtain a certificate from the State Board of Health that he is a graduate of a reputable medical college in the school of medicine to which he belongs; or that he has practised medicine in the State continuously for the period of ten years prior to the eighth day of March, 1881; or that he has been found, upon examination by the Board, to be qualified to practise medicine in all its departments; and makes the practice of, or the attempt by any person to practise, medicine, surgery, or obstetrics in the State without such certificate, unless called from another State to treat a particular case, a misdemeanor punishable by fine or imprisonment, or both, in the discretion of the court. The statute in question is found in §§ 9 and 15 of an act of the State, chapter 93, passed March 15, 1882, amending a chapter of its code concerning the public health. Statutes of 1882, 245, 246, 248. These sections are as follows:

"SEC. 9. The following persons, and no others, shall hereafter be permitted to practise medicine in this State, viz.:

"First. All persons who are graduates of a reputable medical college in the school of medicine to which the person desiring to practise belongs. Every such person shall, if he has not already done so and obtained the certificate hereinafter mentioned, present his diploma to the State Board of Health, or to the two members thereof in his Congressional district, and if the same is found to be genuine, and was issued by such medical college, as is hereinafter mentioned, and the person presenting the same be the graduate named therein, the said Board, or said two members thereof, (as the case may be,) shall issue and deliver to him a certificate to that effect, and such diploma and certificate shall entitle the person named in such diploma to practise medicine in all its departments in this State.

"Second. All persons who have practised medicine in this State continuously for the period of ten years prior to the

eighth day of March, one thousand eight hundred and eighty-one. Every such person shall make and file with the two members of the State Board of Health in the Congressional district in which he resides, or if he resides out of the State in the district nearest his residence, an affidavit of the number of years he has continuously practised in this State, and if the number of years therein stated be ten or more, the said Board or said two members thereof, shall, unless they ascertain such affidavit to be false, give him a certificate to that fact, and authorizing him to practise medicine in all its departments in this State.

" Third. A person who is not such graduate and who has not so practised in this State for a period of ten years, desiring to practise medicine in this State, shall, if he has not already done so, present himself for examination before the State Board of Health or before the said two members thereof in the Congressional district in which he resides, or, if he resides out of the State, to the said two members of the State Board of Health in the Congressional district nearest his place of residence, who, together with a member of the local board of health, who is a physician (if there be such member of the local board) of the county in which the examination is held, shall examine him as herein provided, and if, upon full examination, they find him qualified to practise medicine in all its departments, they, or a majority of them, shall grant him a certificate to that effect, and thereafter he shall have the right to practise medicine in this State to the same extent as if he had the diploma and certificate hereinbefore mentioned. The members of the State Board of Health in each Congressional district shall, by publication in some newspaper, printed in the county in which their meeting is to be held, or if no such paper is printed therein, in some newspaper of general circulation in such district, give at least twenty-one days' notice of the time and place at which they will meet for the examination of applicants for permission to practise medicine, which notice shall be published at least once in each week for three successive weeks before the day of such meeting; but this section shall not apply to a physician or surgeon who is called

from another State to treat a particular case or to perform a particular surgical operation in this State, and who does not otherwise practise in this State."

"Sec. 15. If any person shall practise, or attempt to practise, medicine, surgery or obstetrics in this State, without having complied with the provisions of § 9 of this chapter, except as therein provided, he shall be guilty of a misdemeanor, and fined for every such offence not less than fifty nor more than five hundred dollars, or imprisoned in the county jail not less than one month nor more than twelve months, or be punished by both such fine and imprisonment, at the discretion of the court. And if any person shall file, or attempt to file, as his own, the diploma or certificate of another, or shall file, or attempt to file, a false or forged affidavit of his identity, or shall wilfully swear falsely to any question which may be propounded to him on his examination, as herein provided for, or to any affidavit herein required to be made or filed by him, he shall, upon conviction thereof, be confined in the penitentiary not less than one nor more than three years, or imprisoned in the county jail not less than six nor more than twelve months, and fined not less than one hundred nor more than five hundred dollars, at the discretion of the court."

Under this statute the plaintiff in error was indicted in the State Circuit Court of Preston County, West Virginia, for unlawfully engaging in the practice of medicine in that State in June, 1882, without a diploma, certificate, or license therefor as there required, not being a physician or surgeon called from another State to treat a particular case or to perform a particular surgical operation. To this indictment the defendant pleaded not guilty, and a jury having been called, the State by its prosecuting attorney and the defendant by his attorney, agreed upon the following statement of facts, namely:

"That the defendant was engaged in the practice of medicine in the town of Newburg, Preston County, West Virginia, at the time charged in the indictment, and had been so engaged since the year 1876 continuously to the present time; and has during all said time enjoyed a lucrative practice,

publicly professing to be a physician, prescribing for the sick, and appending to his name the letters M. D.; that he was not then and there a physician and .surgeon called· from another State to ·treat a particular case or to perform a particular surgical operation, nor was he then and there a commissioned officer of the United States army and navy and hospital service; that he has no certificate, as required by § 9, chapter 93, acts of the Legislature of West Virginia, passed March 15, 1882, but has a diploma from ·the 'American Medical Eclectic College of Cincinnati, Ohio;' that ·he presented said diploma to the members of the Board of Health, who reside in his Congressional district, and asked for the certificate as re-·quired by law, but they, after retaining said· diploma for some time, returned it to defendant with their refusal to grant him a certificate asked, because, as ·they claimed, said college did not come under the word reputable as defined by said Board of· Health; that if the defendant had been or should .be pre-·vented from practising medicine it would be a great injury to him, as it would deprive him of his only means of supporting himself and family; that at the time of the· passage of the act of 1882 he had not been practising medicine. ten years, but had only been .practising six, as aforesaid, from the year 1876."

These were all the facts in the case. Upon them the .jury .found the defendant guilty and thereupon he moved an arrest· ·of judgment on the ground that the act of the legislature was unconstitutional and void so far as· it .interfered with ·his vested right in relation ·to the practice of medicine, which· motion was overruled, and to the ruling an exception was taken. The, court thereupon sentenced the defendant to pay a fine of fifty dollars and the costs of the proceedings. The case being taken on .writ of error to the, Supreme Court of Appeals of the State the judgment was affirmed, and to review this judgment the case is brought here.

*Mr. M. H. Dent* for plaintiff in error.

Plaintiff. insists that this statute by forfeiting his right to· continue in the practice of his profession: (1) destroys his

vested rights and deprives him of the estate he had acquired in his profession by years of study, practice, diligence and attention : (2) deprives him of the benefit of an established reputation as a practitioner : (3) depreciates, destroys, and hence deprives him of the value of his invested capital in books, medicines and instruments.

In *Cummings* v. *State of Missouri*, 4 Wall. 277, 320, Judge Field in delivering the opinion of the court says : "The learned counsel does not use these terms — life, liberty and property — as comprehending every right known to the law. He does not include under property those estates which one may acquire in professions, though they are often the source of the highest emoluments and honors."

And in *Ex parte Garland*, 4 Wall. 333, 379, the same Justice, speaking for the court, says : "The attorney and counsellor being, by the solemn judicial act of the court, clothed with his office, does not hold it as a matter of grace and favor. The right which it confers upon him to appear for suitors, and to argue causes, is something more than a mere indulgence, revocable at the pleasure of the court, or at the command of the legislature. It is a right of which he can only be deprived by the judgment of the court, for moral or professional delinquency."

Mr. Blackstone in commenting on the terms life, liberty and property says : "In these several articles consist the rights, or, as they are frequently termed, the liberties of Englishmen ; liberties more generally talked of than thoroughly understood, and yet highly necessary to be perfectly known and considered by every man of rank and property lest his ignorance of the points whereon they are founded should hurry him into faction and licentiousness, on the one hand, or a pusillanimous indifference and criminal submission on the other, and we have seen that these rights consist primarily in the free enjoyment of personal security, personal liberty and of private property. So long as these remain inviolate the subject is perfectly free ; for every oppression must act in opposition to one or the other of these rights, having no other object on which it can possibly be employed." Also, further :

"The third absolute right inherent in every Englishman is that of property, which consists in the free use, enjoyment and disposal of all his acquisitions without any control or diminution save only by the law of the land."

From these authorities the conclusion is inevitable that the terms life, liberty and property, as used in the Constitution, were intended to comprehend *every right* known to the law, which might in any manner become the object of state oppression, and that a man's estate in his profession and the right to the enjoyment of his acquired reputation are as certainly included in the meaning of these terms as his lands and chattels. For the State to enact a law forbidding a man the enjoyment of his own house without the consent of an arbitrary board of examiners is no more unjust than to provide that a man shall not enjoy the benefits of an established practice without a like consent. In either case he is deprived of his vested rights and property by a process rather ministerial than judicial and wholly different from that which is meant by due process of law, the judgment of his peers, or the law of the land. His land cannot be taken from him except by the intervention of an impartial jury of his countrymen; his hard-earned reputation and professional practice should not be less secure.

It was no crime for him to engage in the practice, and having become established in it, the State ought to have no authority to deprive him of the right to continue in it, except for moral or professional delinquency, ascertained by the verdict of an impartial jury of his peers.

In this case the State finds the plaintiff in the full enjoyment of a lucrative practice, the fruits of six years of attention to his profession, with his means invested in necessary medical works, instruments and remedies, forfeits his right to continue in the enjoyment thereof and proceeds to enforce the forfeiture by fine and imprisonment.

It is true it is further provided that if the injured man will gain the consent of an arbitrary board, armed with authority to end his professional career, he can resume his forfeited rights. This is a presumption of guilt, and a requirement that

he must prove his innocence before a tribunal authorized to disregard the proof.

*Mr. Alfred Caldwell,* Attorney General of West Virginia, for defendant in error.

Mr. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

Whether the indictment upon which the plaintiff in error was tried and found guilty is open to objection for want of sufficient certainty in its averments, is a question which does not appear to have been raised either on the trial or before the Supreme Court of the State. The presiding justice of the latter court in its opinion states that the counsel for the defendant expressly waived all objections to defects in form or substance of the indictment, and based his claim for a review of the judgment on the ground that the statute of West Virginia is unconstitutional and void. The unconstitutionality asserted consists in its alleged conflict with the clause of the Fourteenth Amendment, which declares that no State shall deprive any person of life, liberty, or property without due process of law; the denial to the defendant of the right to practise his profession without the certificate required constituting the deprivation of his vested right and estate in his profession, which he had previously acquired.

It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex and condition. This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution. The interest, or, as it is sometimes termed, the estate acquired in them, that is, the right to continue their prosecution, is often of great value to the possessors, and cannot be arbitrarily taken from them, any more

than their real or personal property can be thus taken. But there is no arbitrary deprivation of such right where its exercise is not permitted because of a failure to comply with conditions imposed by the State for the protection of society. The power of the State to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity as well as of deception and fraud. As one means to this end it has been the practice of different States, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely, their possession being generally ascertained upon an examination of parties by competent persons, or inferred from a certificate to them in the form of a diploma or license from an institution established for instruction on the subjects, scientific and otherwise, with which such pursuits have to deal. The nature and extent of the qualifications required must depend primarily upon the judgment of the State as to their necessity. If they are appropriate to the calling or profession, and attainable by reasonable study or application, no objection to their validity can be raised because of their stringency or difficulty. It is only when they have no relation to such calling or profession, or are unattainable by such reasonable study and application, that they can operate to deprive one of his right to pursue a lawful vocation.

Few professions require more careful preparation by one who seeks to enter it than that of medicine. It has to deal with all those subtle and mysterious influences upon which health and life depend, and requires not only a knowledge of the properties of vegetable and mineral substances, but of the human body in all its complicated parts, and their relation to each other, as well as their influence upon the mind. The physician must be able to detect readily the presence of disease, and prescribe appropriate remedies for its removal. Every one may have occasion to consult him, but comparatively few can judge of the qualifications of learning and skill which he possesses. Reliance must be placed upon the assur-

ance given by his license, issued by an authority competent to
judge in that respect, that he possesses the requisite qualifica-
tions.  Due consideration, therefore, for the protection of society
may well induce the State to exclude from practice those who
have not such a license, or who are found upon examination not
to be fully qualified.  The same reasons which control in im-
posing conditions, upon compliance with which the· physician
is allowed to practise in the first instance, may call for further
conditions as new modes of treating disease are discovered, or
a more thorough acquaintance is obtained·of the remedial·prop-
erties of vegetable and mineral substances, or a more accurate
knowledge is acquired of the human system and of the agen-
cies by which it is affected.  It would not be deemed a matter
for serious discussion that a knowledge of the new acquisitions
of the profession, as it from time to time advances in its attain-
ments for the relief of the sick and suffering, should be required
for continuance in its practice, but for the earnestness with
which the plaintiff in error insists that, by being compelled to
obtain the certificate required, and prevented from continuing
in his practice without it, he is deprived of his right·and estate
in his. profession without due process of law.  We perceive
nothing in the statute which indicates an intention of ·the legis-
lature to deprive one of any of his rights.  No one has a right
to practise medicine without having the necessary qualifications
of learning and skill; and the statute only requires that who-
ever assumes, by offering to the community his services as a
physician, that he possesses such learning and skill, shall present
evidence of it by a certificate or license from a body designated
by the State as competent to judge of his qualifications.

As we have said on more than one occasion, it may be diffi-
cult, if not impossible, to give to the terms "due process of
law" a definition which will embrace every permissible exer-
tion of power affecting private rights and exclude such as are
forbidden.· They come to us from the law of England, from
which·country our jurisprudence is to a great extent derived,
and their requirement was there designed to secure the sub-
ject against the arbitrary action of the crown and place him
under the protection of the law.  They were deemed to be

equivalent to "the law of the land." In this country, the requirement is intended to have a similar effect against legislative power, that is, to secure the citizen against any arbitrary deprivation of his rights, whether relating to his life, his liberty, or his property. Legislation must necessarily vary with the different objects upon which it is designed to operate. It is sufficient, for the purposes of this case, to say that legislation is not open to the charge of depriving one of his rights without due process of law, if it be general in its operation upon the subjects to which it relates, and is enforceable in the usual modes established in the administration of government with respect to kindred matters: that is, by process or proceedings adapted to the nature of the case. The great purpose of the requirement is to exclude everything that is arbitrary and capricious in legislation affecting the rights of the citizen. As said by this court in *Yick Wo* v. *Hopkins*, speaking by Mr. Justice Matthews: "When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power." 118 U. S. 356, 369. See, also, *Pennoyer* v. *Neff*, 95 U. S. 714, 733; *Davidson* v. *New Orleans*, 96 U. S. 97, 104, 107; *Hurtado* v. *California*, 110 U. S. 516; *Missouri Pacific Railway Co.* v. *Humes*, 115 U. S. 512, 519.

There is nothing of an arbitrary character in the provisions of the statute in question; it applies to all physicians, except those who may be called for a special case from another State; it imposes no conditions which cannot be readily met; and it is made enforceable in the mode usual in kindred matters, that is, by regular proceedings adapted to the case. It authorizes an examination of the applicant by the Board of Health as to his qualifications when he has no evidence of them in the diploma of a reputable medical college in the school of medicine to which he belongs, or has not practised in the State a designated period before March, 1881. If, in the proceedings under the statute, there should be any unfair

or unjust action on the part of the Board in refusing him a certificate, we doubt not that a remedy would be found in the courts of the State. But no such imputation can be made, for the plaintiff in error did not submit himself to the examination of the Board after it had decided that the diploma he presented was insufficient.

The cases of *Cummings* v. *The State of Missouri*, 4 Wall. 277, and of *Ex parte Garland*, 4 Wall. 333, upon which much reliance is placed, do not, in our judgment support the contention of the plaintiff in error. In the first of these cases it appeared that the constitution of Missouri, adopted in 1865, prescribed an oath to be taken by persons holding certain offices and trusts and following certain pursuits within its limits. They were required to deny that they had done certain things, or had manifested by act or word certain desires or sympathies. The oath which they were to take embraced thirty distinct affirmations respecting their past conduct, extending even to their words, desires and sympathies. Every person unable to take this oath was declared incapable of holding in the State "any office of honor, trust, or profit under its authority, or of being an officer, councilman, director, trustee, or other manager of any corporation, public or private," then existing or thereafter established by its authority; or "of acting as a professor or teacher in any educational institution, or in any common or other school, or of holding any real estate or other property in trust for the use of any church, religious society, or congregation." And every person holding, at the time the constitution took effect, any of the offices, trusts, or positions mentioned, was required, within sixty days thereafter, to take the oath, and if he failed to comply with this requirement it was declared that his office, trust, or position should, *ipso facto*, become vacant.

No person after the expiration of the sixty days was allowed, without taking the oath, "to practise as an attorney or counsellor at law," nor after that period could "any person be competent as a bishop, priest, deacon, minister elder, or other clergyman of any religious persuasion, sect, or denomination to teach or preach, or solemnize marriages." Fine and im-

prisonment were prescribed as a punishment for holding or exercising any of the "offices, positions, trusts, professions, or functions" specified, without taking the oath, and false swearing or affirmation in taking it was declared to be perjury punishable by imprisonment in the penitentiary.

A priest of the Roman Catholic Church was indicted in a Circuit Court of Missouri, and convicted of the crime of teaching and preaching as a priest and minister of that religious denomination, without having first taken the oath, and was sentenced to pay a fine of five hundred dollars, and to be committed to jail until the same was paid. On appeal to the Supreme Court of the State the judgment was affirmed, and the case was brought on error to this court.

As many of the acts from which the parties were obliged to purge themselves by the oath had no relation to their fitness for the pursuits and professions designated, the court held that the oath was not required as a means of ascertaining whether the parties were qualified for those pursuits and professions, but was exacted because it was thought that the acts deserved punishment, and that for many of them there was no way of inflicting punishment except by depriving the parties of their offices and trusts. A large portion of the people of Missouri were unable to take the oath, and as to them the court held that the requirements of its constitution amounted to a legislative deprivation of their rights. Many of the acts which parties were bound to deny that they had ever done were innocent at the time they were committed, and the deprivation of a right to continue in their offices if the oath were not taken was held to be a penalty for a past act, which was violative of the constitution. The doctrine of this case was affirmed in *Pierce* v. *Carskadon*, 16 Wall. 234.

In the second case mentioned, that of *Ex parte Garland*, it appeared that, on the 2d of July, 1862, Congress had passed an act prescribing an oath to be taken by every person elected or appointed to any office of honor or profit under the United States, either in the civil, military, or naval departments of the government, except the President, before entering upon the duties of his office, and before being entitled to his

salary or other emoluments.   On the 24th of January, 1865, Congress, by a supplemental act, extended its provisions so as to embrace attorneys and counsellors of the courts of the United States.   This latter act, among other things, provided that after its passage no person should be admitted as an attorney and counsellor to the bar of the Supreme Court, and, after the 4th of March, 1865, to the bar of any Circuit or District Court of the United States, or of the Court of Claims, or be allowed to appear and be heard by virtue of any previous admission, until he had taken and subscribed the oath prescribed by the act of July 2, 1862.   The oath related to past acts, and its object was to exclude from practice in the courts parties who were unable to affirm that they had not done the acts specified; and, as it could not be taken by large classes of persons, it was held to operate against them as a legislative decree of perpetual exclusion.

Mr. Garland had been admitted to the bar of the Supreme Court of the United States previous to the passage of the act. He was a citizen of Arkansas, and when that State passed an ordinance of secession which purported to withdraw her from the Union, and by another ordinance attached herself to the so-called Confederate States, he followed the State and was one of her Representatives, first in the lower House and afterwards in the Senate of the Congress of the Confederacy, and was a member of that Senate at the time of the surrender of the Confederate forces to the armies of the United States. Subsequently, in 1865, he received from the President of the United States a full pardon for all offences committed by his participation, direct or implied, in the rebellion.   He produced this pardon and asked permission to continue as an attorney and counsellor of this court without taking the oath required by the act of January 24, 1865, and the rule of the court which had adopted the clause requiring its administration in conformity with the act of Congress.   The court held that the law in exacting the oath as to his past conduct as a condition of his continuing in the practice of his profession, imposed a penalty for a past act, and in that respect was subject to the same objection as that made to the clauses of the constitution of Missouri, and was therefore invalid.

There is nothing in these decisions which supports the positions for which the plaintiff in error contends. They only determine, that one who is in the enjoyment of a right to preach and teach the Christian religion as a priest of a regular church, and one who has been admitted to practise the profession of the law, cannot be deprived of the right to continue in the exercise of their respective professions by the exaction from them of an oath as to their past conduct, respecting matters which have no connection with such professions. Between this doctrine and that for which the plaintiff in error contends there is no analogy or resemblance. The constitution of Missouri and the act of Congress in question in those cases were designed to deprive parties of their right to continue in their professions for past acts or past expressions of desires and sympathies, many of which had no bearing upon their fitness to continue in their professions. The law of West Virginia was intended to secure such skill and learning in the profession of medicine that the community might trust with confidence those receiving a license under authority of the State.

*Judgment affirmed.*