### 17200

DR. M. S. DANTZLER, Individually and as President of the South Carolina Naturopathic Physicians Association, et al., Plaintiffs, v. T. C. CALLISON, Attorney General at South Carolina, Defendant

(94 S. E. (2d) 177)

78

*Messrs. Price & Poag,* of Greenville, *for Plaintiffs,*

*Messrs. T. C. Callison, Attorney General,* and *James S. Verner, Assistant Attorney General,* of Columbia, *for Defendant,*

*Messrs. Price & Poag,* of Greenville, *for Plaintiffs,*

84

August 20, 1956.

T. B. GRENEKER, Acting Associate Justice.

This action was brought in the original jurisdiction of this Court, and as the pleadings will be printed, we only state very briefly the allegations thereof.

The plaintiffs allege that the individual plaintiffs are all licensed naturopathic physicians and were admitted to practice in compliance with the law prior to June, 1946, and that the last ten practitioners admitted in the State were admitted under the amended act of 1949. During the 1956 Session of the General Assembly of South Carolina, the following act was adopted:

"Section 1. Sections 56-901 through 56-919, Code of Laws of South Carolina, 1952, are hereby repealed.

"Section 2. It shall be unlawful for any person whether heretofore licensed or not under the laws of this or any other state to practice naturopathy in this State; *Provided,* however, that any person now authorized to practice naturopathy in South Carolina who is a graduate of an accredited college for pre-medical training and who has, in addition thereto, graduated from a medical college recognized at the time of his graduation by the state in which it was located, and who has heretofore for a period in excess of five years engaged in the practice of medicine in the State of South Carolina under the supervision of a licensed medical doctor by special request or by special permission of the State Board of Medical Examiners, or agents thereof, shall be examined by the

State Board of Medical Examiners on the same basis as other applicants to the Board are examined, and upon the making of a passing grade on this examination, shall be licensed to practice medicine in this State." 49 St. at Large, p. 1624.

Section 3 provides for the punishment of the violation of the Act. Section 4 provides that all Act or parts of Acts inconsistent therewith were repealed.

The plaintiffs seek a declaratory judgment as to their rights and contend that the Act is unconstitutional in that it violates the Fifth and Fourteenth Amendments of the Constitution of the United States by depriving them of their property and property rights without due process of law and denies them the equal protection of the law; is arbitrary and discriminatory in that it singles out naturopathy, one of the arts of healing, and abolishes its practice. They further allege that the Act is in violation of Article 1, § 5; Article 1, § 17; and Article 3, § 17, of the Constitution of South Carolina in that it deprives them of their property and property rights without due process of law; denies them equal protection; is arbitrary and discriminatory; and that the Act relates to more than one subject which is not expressed in the title. It is further contended that the plaintiffs entered the practice of naturopathy as a means of a livelihood; they have invested much time and great sums of money; and that naturopathy has been recognized by the General Assembly of South Carolina since 1920; and it is finally contended that the Act is prohibitory and asks that it be declared null and void.

The answer admits that the individual plaintiffs have been practicing naturopathy since their admission and admits the passage of the Act, however, it denies that the Act is in violation of either the State or Federal Constitutions. It is also admitted that by the Act the practice of naturopathy, as a separate cult, is prohibited; and that it makes unlawful certain acts by the plaintiffs, otherwise lawful, but lawful only to those coming under the provisions of the law. Defendant

contends that the purpose of the Act is to protect the public health and welfare and is a valid exercise of the police power of the State, and denies that it is either arbitrary or discriminatory.

We think it may be fairly stated that the questions involved are:

(A) Is the title of the act defective so as to render it unconstitutional in view of Section 17 of Article 3 of the South Carolina Constitution?

(B) Is the Act violative of either the Federal or State Constitutions?

(C) May the State, under the police power, so regulate?

The title of the Act in question is as follows:

"An Act To Repeal Sections 56-901 Through 56-919, Code Of Laws Of South Carolina, 1952, Relating To The Practice Of Naturopathy; To Make It Unlawful For Certain Persons To Practice Naturopathy In This State; And To Provide Penalties For Violating The Provisions Of This Act."

Section 17, Article 3 of the South Carolina Constitution reads as follows:

"Every Act or Resolution having the force of law shall relate to but one subject, and that shall be expressed in the title."

The purpose of this section is to prevent deception of the public and to prevent insertion of matters not germane to the general subject. *Furman v. Willimon,* 106 S. C. 159, 90 S. E. 700; *Miles Laboratories v. Seignious,* D. C., 30 F. Supp. 549.

This section is to be construed with great liberality. *Gasque v. Nates,* 191 S. C. 271, 2 S. E. (2d) 36.

This requirement should not be enforced in any narrow or technical spirit. It was adopted to prevent certain abuses and it should be reasonably and liberally construed on the one hand so as to guard against these abuses, and on the other hand so as not to embarrass or ob-

struct needed legislation. *Alley v. Daniel,* 153 S. C. 217, 150 S. E. 691.

There is no doubt in the mind of this Court as to the validity of the title of the Act, but even if there were some doubt, a statute should be upheld if possible, doubtful cases being resolved in its favor. *Alley v. Daniel, supra.*

The plaintiffs certainly knew the purpose of the Act, for when the bill was before the General Assembly, according to their brief, they say: "We appeared before the House Judiciary Committee and the Senate Medical Committee and filed a printed brief along the lines followed herein."

Plaintiffs rely upon *Ex parte Wachovia Bank & Trust Co. (Nettles v. People's Bank of Darlington),* 160 S. C. 104, 158 S. E. 214, however, we think this authority affords the plaintiffs no comfort as a study of that decision will reveal the difference between that and the instant case.

The purpose of this provision is to prevent "log-rolling legislation"; to prevent surprise or fraud upon the legislature by means of provisions in bills of which the title gave no indication, and which may be, therefore, overlooked and unintentionally adopted; and to apprise the people of the subject of the legislation in order that they may have opportunity of being heard, if they so desire. *McCollum v. Snipes,* 213 S. C. 254, 49 S. E. (2d) 12, and many other authorities therein cited.

What subject, if we may ask, is embraced in the Act which is not referred to in the title or not germane to the purposes of the Act? The plaintiffs direct our attention to none, and none does an examination thereof reveal. It is indeed the duty of this Court to sustain the constitutionality of a sacred act of the legislature unless the contrary most clearly appears from the language of the statute. This Court still adheres to the doctrine that it was not established by the people to assume the duties of legislation, and neither will it declare an act of the legislature unconstitu-

tional unless the language of the Act itself plainly and unmistakably reveals its conflict with the Constitution.

The authorities seem to abundantly differ with plaintiffs' contention, and we so hold.

The plaintiffs contend that the main question for consideration is: "Does the Act deprive the plaintiffs of their property rights without due process of law, and does the Act deny to them equal protection of the law?"

"Naturopathy is one of a number of fields in the art of healing" * * * and has been recognized "as accepted processes of preventive and curative medicine," and every person so practicing, after being duly licensed, "stands for all purposes in the position of a physician in the orthodox fields of medicine * * *." *Williams v. Capital Life & Health Insurance Co.,* 209 S. C. 512, 41 S. E. (2d) 208, 210.

From the record, as well as from an independent examination, we conclude that Naturopathy is of comparatively recent recognition, so far as South Carolina is concerned. The area of its field of practice seems to have increased much more rapidly than the required educational qualifications of those who profess to practice. Indeed, it is rather difficult for the ordinary layman to understand how one may be permitted to practice "the use and practice of physotherapy, minor surgery, obstetrics, gynecology, autotherapy and biologicals," or to "purifying, cleansing and normalizing human tissues for preservation or restoration of health, according to the fundamental principles of anatomy and physiology," without first satisfactorily giving evidence of his unquestioned training and qualifications. Who is to set the standard for such persons? Shall it be the afflicted in mind and body, who plead day and night for relief, or shall it be those who are suddenly stricken in and about their hearts, lungs, stomachs or blood stream, when even the most perfect training, experience and care may not be enough? or should it be the State? The State may not say to its citizens what they must do or to whom they must go in time of mental and physical distress, but we think the State has the

right to say and direct what the qualifications shall be of those persons to whom its citizens turn in their hour of need.

Regardless of anything which may appear to a layman's mind as to what should be the requirements of one who is to diagnose and find out what is the cause and treatment of his illness, it is not a judicial question. It is one of legislative authority. From the record, we find that before the Bill became an Act, the General Assembly provided for hearings before two of its standing committees, and we must assume that the Act is based upon *bona fide,* scientific grounds. *State v. Barnes,* 119 S. C. 213, 112 S. E. 62.

There is no reasonable doubt that the rights of those who have been duly licensed to practice medicine or other professions are property rights of value which are entitled to protection. *Ezell v. Ritholz,* 188 S. C. 39, 198 S. E. 419; and that the right of a person to practice his profession for which he has prepared himself is property of the very highest quality. *Cavassa v. Off,* 206 Cal. 307, 274 P. 523. However, it may be observed that no person has a natural or absolute right to practice medicine, surgery, naturopathy or any of the various healing arts. It is a right granted upon condition. *Allopathic State Board of Medical Examiners v. Fowler,* 50 La. Ann. 1358, 24 So. 809; *Louisiana State Board of Medical Examiners v. Fife,* 162 La. 681, 111 So. 58, 54 A. L. R. 594, affirmed 274 U. S. 720, 47 S. Ct. 590, 71 L. Ed. 1324.

A state may not prohibit the practice of medicine or surgery, yet it is very generally held that a state, under its police power, may regulate, within reasonable bounds, for the protection of the public health the practice of either by defining the qualifications which one must possess before being permitted to practice the same. *Hawker v. People of State of New York,* 170 U. S. 189, 18 S. Ct. 573, 42 L. Ed. 1002; *Dent v. State of West Virginia,* 129 U. S. 114, 9 S. Ct. 231, 32 L. Ed. 623; and of course, it naturally follows that a legislature in defining the required qualifica-

tions cannot prescribe, as a condition to the right to practice, knowledge which bears no relation to the profession in question. However, this in no way means that the legislature, in enforcing its required qualifications which one, in its judgment, should possess to practice medicine, must make requirements for every school of medicine or of the healing arts which may exist, by requiring of those belonging to each particular school a knowledge only of those subjects which the theory of healing, advocated by each school, requires, as was said by the Supreme Court of Louisiana in *Medical Examiners v. Fowler, supra.* In *Allopathic State Board of Louisiana v. Fowler, supra,* the court said, "We know of no constitutional right given to particular persons, who, entertaining peculiar theories of medicine, group themselves together, and call themselves a special school of medicine under a selected name, to be recognized as and delt with as such." 50 La. Ann. 1374, 24 So. 816.

Section 56-901, now repealed, sets forth the field of practice for Naturopaths. Section 56-1354 defines the Practice of Medicine. There is nothing in the existing statutes which will prevent the practice of any subject covered in Section 56-901, now repealed, by any person who has been or may be admitted to practice in conformity with existing legal provisions. By the adoption of the Act complained of, the legislature in no way cut down the field of practice but it did raise the standards of those who would operate in such fields. It was not the profession but it was those who practice the profession that the General Assembly was dealing with. This Act should be treated and construed as imposing additional qualifications upon persons already in the profession. It is an effort on the part of the legislature to regulate one phase of the healing arts and should be construed in *pari materia* with other statutes relating to the subject. It is not for us to reason why or what prompted the legislature to adopt the statute. It was not without the benefit of the actions of its committees which initially considered the matter. As was said in *Barsky v. Board of Regents of Uni-*

*versity of State of New York,* 347 U. S. 442, 74 S. Ct. 650, 655, 98 L. Ed. 829, "It is equally clear that a state's legitimate concern for maintaining high standards of professional conduct extends beyond initial licensing. Without continuing supervision, initial examinations afford little protection."

In *Williamson v. Lee Optical of Okl.,* 348 U. S. 483, 75 S. Ct. 461, 99 L. Ed. 563, there was an attempt to strike down a statute which prohibited opticians from fitting or duplicating eye glasses without a prescription. The contention was made that the Act violated the due process clause of the Constitution. The Supreme Court of the nation denied this contention, holding that in matters of public health, the power of the legislature is exceedingly broad and it was not for the courts but for the legislature to determine the need for such regulation as a protection of the public.

We do not know what was the legislative mind. For good and sufficient reasons, it may have concluded that "a little learning is a dangerous thing" and that those who would undertake to treat or manipulate the human body must "drink deep or touch not." We of course must assume that it knew of the decisions of this Court involving Naturopathy in *Dantzler v. Callison,* 227 S. C. 317, 88 S. E. (2d) 64; *Jacoby v. South Carolina State Board,* 219 S. C. 66, 64, S. E. (2d) 138; and *Williams v. Capital Life, supra.* However, the right to practice medicine is a qualified one and is held in subordination to the duty of the State under the police power to protect the public health. *Lawrence v. Board of Registration,* 239 Mass. 424, 132 N. E. 174. The police power can not be stipulated or bartered away. *Gray v. State of Connecticut,* 159 U. S. 74, 15 S. Ct. 985, 40 L. Ed. 80.

No person can acquire a vested right to continue, when once licensed, in a business, trade or profession which is subject to legislative control and regulation under the police power, as regulations prescribed for such may be changed or modified by the legislature, in the public interest, without subjecting the action to the charge of in-

terfering with contract or vested rights. *State v. Hovorka,* 100 Minn. 249, 110 N. W. 870, 871, 8 L. R. A., N. S., 1272, 1273.

The granting of a license to practice certain professions is the method taken by the State, in the exercise of its police power, to regulate and restrict the activity of the licensee. He takes the same, subject to the right of the State, at any time, for the public good to make further restrictions and regulations. It is a matter of common knowledge that derivatives of opium or similar drugs could be purchased in former years at even a country store. The State has now prohibited this and a druggist may not sell morphine or drugs of that nature without a prescription from a duly licensed authority. If the restrictions are reasonable, they would be upheld even though they actually prohibit some people from further engaging in such occupations or professions under a license previously granted. See note 8 L. R. A., N. S., 1273.

It is universally held that it is competent for the legislature to prescribe qualifications for those who are to practice medicine and thus to assure that they shall possess the requisite character and learning, *Dent v. State of West Virginia,* 129 U. S. 114, 9 S. Ct. 231, 32 L. Ed. 623, and the State may change the qualifications from time to time, making them more rigid. *Dent v. State of West Virginia, supra.* It lies within the police power to require educational qualification of those already engaged in the practice of any profession. *Hawker v. People of State of New York,* 170 U. S. 189, 18 S. Ct. 573, 42 L. Ed. 1002.

In *Commonwealth v. Zimmerman,* 221 Mass. 184, 108 N. E. 893, 895, and in *State v. Smith,* 233 Mo. 242, 135 S. W. 465, 33 L. R. A., N. S., 179, we find that statutes somewhat similar to the instant statute were under attack along the same lines which the plaintiffs herein argue. It was there held: "The protection of the public from those who undertake to treat or manipulate the human body without that degree of education, training and skill which the

Legislature has prescribed as necessary to the general safety of the people is within the police power of the state. * * * The protection of the public health is an object of such vital importance to the welfare of the state that any rational means to that end must be upheld."

Indeed we may assume that the Legislature, in its wisdom, may have concluded that "the limited practitioner is likely to do a great deal of harm, not only because he is not thoroughly educated as a physician, but as he is only licensed to use a certain system of treatment, he is apt to use it in cases to which it is not adapted."

In *Williams v. Capital Life & Health Ins. Co., supra,* Mr. Chief Justice Baker, now retired, speaking for this Court, said: "While this is not in any sense controlling, we may advert to the fact that it is a matter of common knowledge that the people who purchase sick benefit policies of the industrial type constitute a large proportion of the patrons of practitioners of such branches of healing or medicine as naturopathy, and that it is generally believed by such people that they are dealing with licensed practitioners of medicine." May we ask, after all, why should not persons who hold themselves out to be doctors, regardless of what they may otherwise profess, be required to have the training of a medical doctor?

In *Davis v. Beeler,* Tenn., 207 S. W. (2d) 343, 347, in which an appeal was dismissed by the U. S. Supreme Court, 333 U. S. 859, 68 S. Ct. 745, 92 L. Ed. 1138, a statute strikingly similar to that here was contested on practically the same grounds as in the instant action. There the General Assembly adopted a statute which first repealed the act authorizing the licensing of naturopaths, and second, prohibited the practice of naturopathy. It appears that there were some two hundred licensed naturopaths in Tennessee at the time. Practically every question raised in the action before us was presented to the Tennessee Court which held adversely to the contentions of the plaintiffs there and here, the Court saying: "Evidently, the Legislature thought there

was too much border-lining in the practice of naturopathy and determined to stamp out the evil that was not in the science but in the practicing of it, to the definite injury of credulous sufferers."

 Where the primary duty and responsibility for determining a question rests with the Legislature, this Court will not substitute its judgment for that of the legislative authority.

It is our opinion that the enactment in question is a valid exercise of the police power of the State and that no unwarranted discrimination appears in the Act, and

It is so ordered.

Let the complaint and answer be published herewith.

STUKES, C. J., and OXNER, LEGGE and MOSS, JJ., concur.