# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Opternative, Inc., Appellant,

v.

South Carolina Board of Medical Examiners and the South Carolina Department of Labor, Licensing and Regulation, Respondents,

and

South Carolina Optometric Physicians Association, Respondent-Intervenor.

Appellate Case No. 2024-001321

———————

Appeal from Richland County
Kristi F. Curtis, Circuit Court Judge

———————

Opinion No. 28310
Heard June 3, 2025 – Filed January 21, 2026

———————

**AFFIRMED**

———————

Joshua A. Windham and Robert J. McNamara, of the Institute for Justice, of Arlington, VA; Miles Edward Coleman, of Nelson Mullins Riley & Scarborough, LLP, of Greenville, all for Appellant Opternative, Inc.

Kirby Darr Shealy III, of Adams and Reese LLP, of Columbia, for Respondent-Intervenor South Carolina Optometric Physicians Association; Eugene Hamilton Matthews, of Richardson Plowden & Robinson, PA, of

Columbia, for Respondents South Carolina Board of Medical Examiners and South Carolina Department of Labor, Licensing and Regulation.

---

**JUSTICE FEW:** In this direct appeal from the circuit court, Opternative, Inc. challenges the Eye Care Consumer Protection Law—sections 40-24-10 and 40-24-20 of the South Carolina Code (Supp. 2025)—as violative of equal protection and due process under article I, section 3 of the South Carolina Constitution. The Act prohibits eye doctors from prescribing "spectacles" or "contact lenses"—both defined terms—based solely on information generated by automated equipment designed to measure refractive error. §§ 40-24-10 to -20.

The specific language at issue is, "A person in this State may not dispense spectacles or contact lenses to a patient without a valid prescription from a provider," § 40-24-20(A), and "A prescription for spectacles or contact lenses may not be based solely on the refractive eye error of the human eye or be generated by a kiosk," § 40-24-20(C). The term "Kiosk" is defined as "automated equipment or an automated application, which is designed to be used on a phone, computer, or Internet-based device that can be used in person or remotely to provide refractive data or information." § 40-24-10(4).

Opternative is a telehealth company that developed automated software which allows individuals to use a computer or smartphone to determine the refractive error of their eyesight without the need for an in-person visit to an optometrist or ophthalmologist. Opternative concedes the deferential rational basis test applies to its constitutional challenges, but it argues the Act fails to rationally further any goal beyond mere economic protectionism. We disagree and affirm the circuit court's grant of summary judgment in favor of the defendants.

## I.      Facts and Procedural History

Opternative is a Chicago-based company that developed an eye test by which people can use a computer or smartphone to determine the refractive error of their eyesight. Opternative's test is FDA approved, and it currently offers its technology in thirty-five states. Opternative provided its test in South Carolina from 2014 until 2016, when the Eye Care Consumer Protection Law went into effect.

Opternative's test is free for users to complete. Users must be between the ages of eighteen and fifty-five and have previously received a lens prescription to be able to take the test.

When users visit Opternative's website and want to take the test, they must first fill out a medical history form, which includes information about their previously received lens prescription. Opternative's website provides a disclaimer: "The [test] does not perform or replace a comprehensive eye examination, nor does it assess eye health. Consult an eye care professional for a comprehensive eye examination yearly or any time you are experiencing pain or discomfort. This test is not intended to diagnose, treat, mitigate, or cure disease."

Users complete the test by standing ten feet away from a computer screen and using their voice or cell phone to answer the questions provided by the vision test. The test is similar to what a user would experience taking an eye exam using an eye chart.

Once a user completes the test, he or she can pay $35 to send the results to a licensed optometrist or ophthalmologist in the user's state for review. The eye doctors can see the results of the Opternative test through software provided by a third-party company—Optimized Eye Care—which partners with Opternative and contracts with optometrists and ophthalmologists. When an optometrist or ophthalmologist receives a user's information, they can either decide to write a lens prescription for the user or decide it is not medically appropriate to write a prescription. Opternative's partnering eye doctors do not use Opternative to diagnose customers' underlying health conditions or symptoms (other than visual acuity) or to perform a contact lens fitting. If the eye doctor decides it is appropriate to write a prescription, the customer will typically receive that prescription through Opternative's website within twenty-four hours.

Opternative contracts with various online contact lens retailers, who link to Opternative's test on their websites to allow the users to easily access the test, receive a prescription, and buy contacts from the online retailers. Opternative also wholly owns an online contact lens retailer—Next Day Contacts, LLC—which links to Opternative's online test.

On May 11, 2016, the South Carolina General Assembly ratified the Eye Care Consumer Protection Law. Act No. 173, 2016 S.C. Acts 1372. The Act provides:

(A) A person in this State may not dispense spectacles or contact lenses to a patient without a valid prescription from a provider.

(B) To be valid, a prescription must contain an expiration date on spectacles or contact lenses of one year from the date of examination by the provider or a statement of the reasons why a shorter time is appropriate based on the medical needs of the patient. The prescription must take into consideration medical findings made and refractive error discovered during the eye examination. . . .

§ 40-24-20 (A-B). The Act also provides that "[a] prescription for spectacles or contact lenses may not be based solely on the refractive eye error of the human eye or be generated by a kiosk." § 40-24-20(C). The Act defines a "Kiosk" as "automated equipment or an automated application, which is designed to be used on a phone, computer, or Internet-based device that can be used in person or remotely to provide refractive data or information." § 40-24-10(4).

The South Carolina Optometric Physicians Association (SCOPA)—an association of optometrists practicing in South Carolina—lobbied for the General Assembly to pass the bill. Governor Nikki Haley vetoed the bill after it was ratified because she believed "it uses health practice mandates to stifle competition for the benefit of a single industry." S.C. State Library (Digital Collections), *Veto of S.1016*, https://tinyurl.com/a7w4kfdy (last visited Jan. 5, 2025). On May 19, 2016, the General Assembly overrode Governor Haley's veto by a vote of 98 to 1 in the House and 39 to 3 in the Senate. After the Act went into effect, Opternative stopped providing its service in South Carolina because "South Carolina eye doctors were no longer willing to use [Opternative's] online vision test to collect information from patients remotely and to prescribe corrective lenses for patients based on that information."[1]

On October 20, 2016, Opternative sued the South Carolina Board of Medical Examiners and the South Carolina Department of Labor, Licensing, and Regulation,

---

[1] The Act prohibits eye doctors from writing lens prescriptions based *solely* on automated equipment. § 40-24-20(C). As the circuit court noted, it would not be prohibited by the Act for eye doctors to use Opternative's test in conjunction with an in-person eye examination.

challenging the constitutionality of the Eye Care Consumer Protection Law. SCOPA moved to intervene as a defendant, and the circuit court granted the motion. The circuit court granted summary judgment in favor of the defendants, holding Opternative lacked standing to bring the lawsuit. The court of appeals reversed the circuit court's decision on standing and remanded to the circuit court to address the merits of the case. *Opternative, Inc. v. S.C. Bd. of Med. Exam'rs*, 433 S.C. 405, 859 S.E.2d 263 (Ct. App. 2021). SCOPA filed a petition for a writ of certiorari with this Court. We granted the petition, dispensed with briefing, and issued an opinion affirming the court of appeals, but clarifying "the decision of the court of appeals as to standing should in no way be construed as a comment on the merits of the action." *Opternative, Inc. v. S.C. Bd. of Med. Exam'rs*, 437 S.C. 258, 260, 878 S.E.2d 861, 863 (2022).

After remand, Opternative and the defendants filed cross motions for summary judgment on the merits of the case. The circuit court granted summary judgment in favor of the defendants. The circuit court held the Act's "legislative purpose is to protect the public from receiving inadequate eye care" and the provisions of the Act "are reasonably related to protecting and upholding the applicable statutory standard of care for medical professionals in South Carolina."

Opternative filed a notice of appeal directly in this Court under Rule 203(d)(1)(A)(ii), SCACR, because the circuit court's order was a "final judgment involving a challenge on state . . . grounds to the constitutionality of a state law."

## II.    Standard of Review

Opternative argues the circuit court applied the incorrect test for rational basis review by requiring the statute to be upheld unless the challenger could negate every conceivable basis supporting it. This Court has repeatedly held, however, that under rational basis review, the challenger bears the burden of disproving every conceivable basis for the statute. *See, e.g.*, *Boiter v. S.C. Dep't of Transp.*, 393 S.C. 123, 128, 712 S.E.2d 401, 403 (2011) ("Those attacking the validity of legislation [under the rational basis test of the Equal Protection Clause] have the burden to negate every conceivable basis which might support it." (alteration in original) (quoting *Lee v. S.C. Dep't of Nat. Res.*, 339 S.C. 463, 470 n.4, 530 S.E.2d 112, 115 n.4 (2000))); *Ani Creation, Inc. v. City of Myrtle Beach Bd. of Zoning Appeals*, 440 S.C. 266, 285, 890 S.E.2d 748, 758 (2023) ("A party challenging a legislative enactment under rational basis review 'must negate every conceivable basis which might support' the enactment and, therefore, has a 'steep hill to climb.'" (citation omitted)); *McLeod v. Starnes*, 396 S.C. 647, 656, 723 S.E.2d 198, 204 (2012)

(describing the conceivable basis standard as "our long-held rational basis rule"). Thus, the circuit court did not err by referring to the "conceivable basis" test in this case.

### III.    Substantive Due Process

When a statute is challenged on substantive due process grounds, the question under rational basis review is whether the statute "bears a reasonable relationship to any legitimate interest of government." *R.L. Jordan Co. v. Boardman Petroleum, Inc.*, 338 S.C. 475, 478, 527 S.E.2d 763, 765 (2000).

The first question is whether the Act furthers a legitimate government interest. Opternative argues the only justification for the Act is economic protectionism. SCOPA argues the circuit court correctly found the Act achieves the legitimate government interest of protecting public health by ensuring a patient's corrective lenses are prescribed only after an appropriate in-person eye exam.

The Record contains extensive evidence regarding the public health benefits of an in-person eye exam—benefits that are lost when prescriptions for corrective lenses are based solely on information generated by automated equipment. The affidavits of Dr. Melvin Shipp and Dr. Mark Robinson are two sources of information about these benefits.

Shipp is a licensed optometrist and a professor at The Ohio State University College of Optometry. Shipp's affidavit provides, "An optometrist that conducts a comprehensive eye exam can detect and diagnose certain diseases of the eye, such as glaucoma, cataracts, macular degeneration, binocular vision disorders and corneal dystrophy. They can also detect diabetes, hypertension, hypercholesterolemia, auto-immune disorders and other systemic diseases." Shipp explained these "diseases of the eye or of the body may go undiagnosed if patients merely elect to purchase corrective lenses using remote eye refraction measurement tools without an in-person eye examination."

Shipp also explained "irritation" caused by "[a] poorly fit contact lens" can lead to "scarring and vision loss," even though the patient shows no symptoms. Shipp stated, "Such consequences of a poorly fit contact lens can only be detected by a corneal evaluation." Shipp noted "Opternative's Technology does not perform a corneal examination and evaluation."

Shipp also discussed the "risk that individuals may mistakenly believe that they have received an eye examination after receiving a prescription for spectacles or contact lenses from an ophthalmologist or optometrist following an Opternative examination."

Robinson is a "Neuro-ophthalmologist practicing at Palmetto Health/University of South Carolina." Robinson's affidavit provides, "Corneal irritation and contact lens over-wear increase the risk of a corneal infection," which "can be detected on corneal examination"—something "Opternative's Technology does not perform." Robinson highlighted that "a face-to-face visit with an eye care provider allows the provider to emphasize the importance of not over-wearing contact lenses and the importance of contact lens hygiene." Robinson also discussed how the same "diseases of the eye or body" discussed in Shipp's affidavit may go undiagnosed if patients forgo in-person, comprehensive eye examinations.

Shipp's and Robinson's affidavits also contain information that supports the opposite conclusion. However, under deferential rational basis review, there is enough to reach the conclusion that a legitimate government interest the Act promotes is the protection of public health. *See Dantzler v. Callison*, 230 S.C. 75, 96, 94 S.E.2d 177, 188 (1956) ("The protection of the public health is an object of such vital importance to the welfare of the state that any rational means to that end must be upheld." (quoting *Commonwealth v. Zimmerman*, 108 N.E. 893, 895 (Mass. 1915))).

Now that we have addressed the Act's legitimate government interest in protecting public health, the next question is whether the Act bears a reasonable relationship to that government interest. Opternative argues it does not because the American Academy of Ophthalmology's policy statement provides that in-person exams are not always medically necessary before prescribing corrective lenses. However, Robinson's affidavit notes that "almost all practicing eye care providers are very rarely providing a refraction without any eye exam, unless they had previously given the patient an eye examination within the prior year." Thus, while a comprehensive, in-person eye exam may not always be medically necessary, in practice, most eye doctors conduct such exams before prescribing corrective lenses to detect potential diseases or conditions. Given this standard practice, the General Assembly could reasonably conclude that frequent in-person exams are necessary to protect the public from eye and systemic health issues.

For these reasons, under the minimal scrutiny required by the rational basis standard, the Act bears a reasonable relationship to a legitimate interest of government and does not violate due process.

## IV. Equal Protection

"Under the rational basis test, the requirements of equal protection are satisfied when: (1) the classification bears a reasonable relation to the legislative purpose sought to be affected; (2) the members of the class are treated alike under similar circumstances and conditions; and, (3) the classification rests on some reasonable basis." *Denene, Inc. v. City of Charleston*, 359 S.C. 85, 91, 596 S.E.2d 917, 920 (2004).

In determining whether the classification reasonably relates to the legislative purpose, the first question is: What is the class being classified? Based on the statute's prohibition, the class that is discriminated against is simply eye doctors who prescribe lenses based solely on an automated application. This classification bears a reasonable relation to the legislative purpose for the same reasons explained in the Substantive Due Process section of this opinion.

The next question is whether the members of the class are treated alike under similar circumstances and conditions. The Act provides a uniform standard for members of the class. Thus, the Act does not treat certain members differently than others.

The final question is whether the classification rests on some reasonable basis. Opternative argues it does not because doctors who prescribe lenses are treated differently from doctors who can prescribe anything else under the South Carolina Telemedicine Act.

The General Assembly adopted the South Carolina Telemedicine Act on June 3, 2016. Act No. 210, 2016 S.C. Acts 1502 (codified at S.C. Code Ann. § 40-47-37 (Supp. 2025)). The Telemedicine Act made clear doctors could treat patients using electronic information technology that sends information "between a licensee in one location and a patient in another location" if the doctors could still "adhere to the same standard of care as in-person medical care." S.C. Code Ann. §§ 40-47-37(A)(1), 40-47-20(53) (Supp. 2025). It also established doctors could not prescribe medication "when an in-person physical examination is necessary for diagnosis." § 40-47-37(C)(8).

The Eye Care Consumer Protection Law addresses a narrow problem that comes from the unique risks associated with eye health and the problems corrective lenses cause. Simply because doctors can prescribe treatment based on telemedicine in different contexts—including eye doctors prescribing serums and eye drops—does

not mean it is unreasonable for the General Assembly to address the specific risks associated with prescribing corrective lenses. Many other areas of medicine would likely benefit from required in-person examinations before a doctor prescribes treatment or medication. However, "It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *SPUR at Williams Brice Owners Ass'n, Inc. v. Lalla*, 415 S.C. 72, 88, 781 S.E.2d 115, 124 (Ct. App. 2015) (quoting *Ry. Express Agency v. People of State of N.Y.*, 336 U.S. 106, 110, 69 S. Ct. 463, 466, 93 L. Ed. 533, 539 (1949)).

Further, in many other forms of telemedicine, physicians diagnose and treat patients by reviewing photographs, videos, or live video consultations that allow them to visually assess the patient's condition. This approach still involves a direct evaluation of the patient's physical symptoms. In contrast, prescribing corrective lenses based solely on a patient's responses to an automated eye chart—without the eye doctor ever visually examining the patient's eyes—is fundamentally different. It eliminates any opportunity for the eye care provider to detect underlying diseases that may not affect visual acuity but could pose serious health risks if left undiagnosed. Thus, the Act does not violate equal protection.

## V.    Conclusion

In light of the speed in which artificial intelligence and other technology continues to develop, we are confident the General Assembly will continue to monitor the policy rationale behind the Eye Care Consumer Protection Law. At this point, however, we cannot say the Act is irrational or wholly unrelated to a legitimate government interest. Thus, we hold the Act passes constitutional muster under rational basis review.

**AFFIRMED.**

**KITTREDGE, C.J., JAMES, HILL and VERDIN, JJ., concur.**